**CONNELLY CONTAINERS, INC., Plaintiff,**

v.

**Louis J. BERNARD, d/b/a Bernard Brokerage, and the Georgia–Pacific Corp., Defendants.**

**No. 87 Civ. 8045 (JMW).**

United States District Court, S.D. New York.

July 11, 1989.

Robert Cohen, Howard Schrader, Dechert, Price & Rhoads, New York City (Richard D. Gluck, Lane & Mittendorf, Washington, D.C., of counsel), for plaintiff.

Kenneth Kramer, James Tallon, James Rolfes, Shearman & Sterling, New York City, for defendant Georgia Pacific.

Louis J. Bernard, Kalamazoo, Mich., pro se.

## OPINION AND ORDER

WALKER, District Judge:

Before the Court is a motion for summary judgment by defendants Georgia–Pacific Corporation ("Georgia–Pacific") and Louis J. Bernard, doing business as Bernard Brokerage ("Bernard"),[1] in an action under common law challenging the defendants' conduct in securing a multi-million dollar government procurement contract for triple-wall fiberboard. Previously, by stipulation, plaintiffs' claims brought under the Administrative Procedures Act, challenging the Government Services Agency's (GSA's) determination that Georgia–Pacific was a "responsible" bidder, were dismissed with prejudice. Thus, in addition to customary summary judgment issues, this motion raises the complicated issue of the extent to

---

1. Bernard is acting *pro se*. His motion papers broadly deny Connelly's allegations and request summary judgment. Since Bernard agrees with Georgia–Pacific's legal arguments, this memorandum addresses the arguments raised by Georgia–Pacific. *See* Bernard Rep.Mem. at 2 ("I also have read the Summary Judgement submitted by Georgia Pacific (the Co Defendant in the case) and my opinions in reference to their Summary Judgement motion are the same.").

which the prior stipulated dismissal bars plaintiff's common law claims against Georgia–Pacific and Bernard under the doctrines of issue and claim preclusion.

Having carefully reviewed the parties' pleadings, memoranda, and extensive supporting documents, affidavits, and depositions and having heard oral arguments, this Court finds that although plaintiff's common law claims are not fully barred by issue or claim preclusion arising out of its stipulated dismissal of the GSA, plaintiff has failed to introduce sufficient specific evidence to raise a genuine issue of fact for a jury to decide or to warrant further discovery.

## I. Background

Georgia–Pacific is an integrated paper products manufacturer, which produces and sells, among other products, corrugated fiberboard and fiberboard boxes. Its Canton, Ohio, plant makes a variety of corrugated products, including triple-wall corrugated fiberboard ("triple-wall"), which only a small number of plants in the United States are equipped to produce. The capital investment necessary to purchase the machinery to manufacture triple-wall is in the range of $7 to $15 million.

In late December 1986, Dick McClintock, general manager of the Canton plant, accepted Bernard's offer of assistance in bidding for government contracts, principally for triple-wall. McClintock Aff. ¶ 7.[2] Bernard was to bring new solicitations to McClintock's attention, handle the administrative tasks related to the bidding process, and assist in the implementation of any contracts awarded to Georgia–Pacific in exchange for a contingent three-percent commission. McClintock Aff. ¶¶ 8–9.

Bernard also suggested and negotiated freight rates for Georgia–Pacific.[3] McClintock Dep. at 14–16. He was able to obtain favorable freight rates from various trucking companies by representing to them that he could channel significant volume to them through his representation of bidders on government procurement contracts. Bernard Dep. at 76–76. Since delivery cost is a key element in pricing corrugated paper products, any savings that Bernard was able to obtain were of considerable value to Georgia–Pacific. Connelly Aff. ¶ 3; McClintock Dep. at 56.

From the end of 1986 to October 7, 1987, Georgia–Pacific bid on five contracts that Bernard brought to its attention. In each case, Bernard suggested to McClintock what he considered to be a reasonable bid for each line item on which he believed Georgia–Pacific ought to bid. McClintock Aff. ¶ 10. According to McClintock, his staff evaluated the suggested prices on the company's proprietary computer system, and he approved the bids at the suggested price if the price fell within the computer-generated range. McClintock Aff. ¶ 10. Connelly notes that although McClintock may have had final authority to determine bid prices, he approved most or all prices that Bernard suggested to him for the triple-wall solicitations on which Georgia–Pacific made bids. P.Mem. at 15 (citing a comparison of Bernard's worksheets prepared for Georgia–Pacific, Exh. 8, with Georgia–Pacific bid, Exh. 7).

The parties sharply disagree as to the sources of information Bernard used in arriving at the recommended bids for his worksheets. Bernard claims that he did not use cost information but, even if he did, such information is publicly available. Bernard Dep. at 123–24. Relying on Bernard's deposition testimony that he did not use public information to compute bid prices, Connelly infers that Bernard used proprietary cost information obtained from discussions with other fiberboard manufacturers that he represented, and that access to overhead costs would give him "an enormous competitive advantage in determining

2. References are throughout: Affidavit ("Aff."); Deposition ("Dep."); Transcript ("T."); Exhibit ("Exh."); Plaintiff's Memorandum ("P.Mem.").

3. During oral argument, Bernard stated that the idea behind his brokerage business was to match corrugated fiberboard manufacturers

with solicitations for products to be delivered near their plants, where decreased transportation costs gave such bidders a substantial cost advantage over more distant manufacturers. T. at 24–25.

what would likely be a successful bid." P.Mem. at 16–17; Connelly Aff. ¶ 3.

In June 1987, Bernard met with McClintock and Adams, the Canton plant sales manager, to discuss whether McClintock should bid on GSA's 1987 annual triple-wall solicitation ("Triple–Wall Solicitation"). McClintock signed off on Bernard's suggested bid, and Bernard handled the paper work. In a letter dated August 26, 1987, GSA notified McClintock that Georgia–Pacific was the low bidder on many line items of the Triple–Wall Solicitation. Exh. 8.

On September 10, 1987, Connelly filed an administrative protest with the GSA arguing that Georgia–Pacific was "nonresponsible" within the meaning of federal regulations governing the bidding process because Bernard had represented competing fiberboard manufacturers in previous solicitations. Exh. 9. The GSA rejected Connelly's protest. Exh. 1.[4]

Following the GSA determination, Connelly brought suit against the GSA and the current defendants. Counts I, II, and III of plaintiff's First Amended Complaint pleaded claims under the Administrative Procedure Act ("APA") generally challenging GSA's determination based on the facts before it and the sufficiency of its investigation. Exh. 21, ¶¶ 72, 77, 83. However, by stipulation dated September 28, 1988, Connelly agreed to a dismissal of Counts I, II, and III of the First Amended Complaint "with prejudice and without costs to any party" and thereby removed the United States from the suit. Exh. 20.[5] The Second Amended Complaint retained claims for damages from Bernard and Georgia Pacific based on theories of unjust enrichment and tortious interference with Connelly's prospective business relationships with GSA and a claim for punitive damages from Bernard. Exh. 2, ¶¶ 79, 82, 84. It is the September 28 stipulation that is the focus of this Court's initial inquiry.

## II.  Discussion

### A.  Issue and Claim Preclusion

Defendants first argue that the doctrines of issue or claim preclusion bar plaintiff from asserting its remaining common-law claims, because the stipulated dismissal with prejudice of plaintiff's claims against the GSA resolved all outstanding issues in defendants' favor. Connelly contests this conclusion, pointing to the lower standards of proof required by the common law claims; the availability of the full trial record, instead of merely the administrative record, to make its case under common law; and the limited reach of its stipulated dismissal. After careful consideration of parties' detailed submissions, and upon review of this motion's extensive oral argument, the Court finds that the doctrines of issues or claim preclusion do not absolutely bar plaintiff's remaining claims.

### 1.  The Doctrines of Claim and Issue Preclusion

The doctrine of res judicata, or claim preclusion, bars a losing party from relitigating a cause of action in which a judgment on the merits has been rendered in a previous action between the same parties or their privies. *Montana v. United*

---

**4.** GSA's letter reads, in relevant part:

> The basis for the protest is Connelly's contention that the repeated representation of multiple bidders by Bernard Brokerage, both before and after submission of bids in the instant solicitation, requires a finding of non-responsibility in the instant solicitation because Bernard Brokerage lacks a satisfactory record of integrity.

> . . . . .

> After a thorough review of all the facts of this case, we have concluded that the circumstances which led to our findings of non-responsibility under the aforementioned solicitations are not present in the instant procurement. Mr. Bernard was designated as sales representative for only one bidder in connection with this solicitation and there is no evidence that its prices were disclosed to any other offeror prior to bid opening. Moreover, there is no evidence that potential bidders failed to submit bids under this solicitation as a result of any anti-competitive practices on the part of Mr. Bernard or Georgia Pacific.

**5.** Plaintiff cites two reasons for dismissing the GSA from its suit: (1) it felt that it could not meet the burden of showing, on the administrative record alone, that GSA's actions were arbitrary, capricious, or an abuse of discretion within the meaning of the APA, 5 U.S.C. § 706; and (2) declaratory relief without more would be of no practical advantage to it. Cohen Aff., ¶ 6.

*States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979); *Expert Electric, Inc. v. Levine,* 554 F.2d 1227, 1232 (2d Cir.), *cert. denied,* 434 U.S. 903, 98 S.Ct. 300, 54 L.Ed.2d 190 (1977). The threshold question as to whether the claims in two proceedings are duplicative "is not a matter of precision, nor subject to the application of any mechanical formula," but the "crucial element" underlying the inquiry is "the factual predicate of the several claims asserted." *Expert Electric,* 554 F.2d at 1234. "For it is the facts surrounding the transaction or occurrence which operate to constitute the cause of action, not the legal theory upon which a litigant relies." *Id.* Once the court determines that the claims are identical, the previous judgment is res judicata "not only to all matters pleaded, but to all that might have been" and "not only to all matters litigated and decided by it, but as to all relevant issues which could have been but were not raised and litigated in the suit." *Teltronics v. L M Ericsson Telecommunications,* 642 F.2d 31, 35 (2d Cir.1981) (quoting *Heiser v. Woodruff,* 327 U.S. 726, 735, 66 S.Ct. 853, 857, 90 L.Ed. 970 (1946)).

Although the doctrine of claim preclusion requires that the parties to the two actions be identical for the first judgment to bar the later claim, "the trend is toward a relaxation of strict mutuality by a broadening of the concept of parties and their privies." *Cahill v. Arthur Anderson & Co.,* 659 F.Supp. 1115, 1120–21 (S.D.N.Y. 1986) (Cederbaum, J.). *See also Amalgamated Sugar Co. v. NL Industries, Inc.,* 825 F.2d 634, 640 (2d Cir.1987) ("The doctrine of privity, which extends the res judicata effect of a prior judgment to non-parties who are in privity with the parties of the first action, is to be applied with flexibility.").

The same consequences that legally flow from an adverse judgment on the merits

bind a plaintiff with respect to the claims dismissed with prejudice by stipulation. In *Nemaizer v. Baker,* 793 F.2d 58 (2d Cir. 1986), the Second Circuit confirmed that the doctrine of res judicata applies with full force to claims that the parties consented to dismiss with prejudice in a prior action:

> A dismissal with prejudice has the effect of a final adjudication on the merits favorable to the defendant and bars future suits brought by the plaintiff upon the same cause of action. Such a dismissal constitutes a final judgment with the preclusive effect of '*res judicata* not only as to all matters litigated and decided by it, but also as to all relevant issues which could have been but were not raised and litigated in the suit.'

*Id.* at 60–61 (citations omitted).[6]

The related doctrine of collateral estoppel, or issue preclusion, bars "the relitigation of an issue of law or fact that was raised, litigated and actually decided by a prior judgment in a prior proceeding between the parties, if the determination of that issue was essential to the judgment, regardless of whether or not the two proceedings were based on the same claim." *N.L.R.B. v. United Technologies Corp.,* 706 F.2d 1254, 1260 (2d Cir.1983). The party seeking to bar relitigation of the issue as a defense need not have been a party to the original action. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326–28, 99 S.Ct. 645, 649–50, 58 L.Ed.2d 552 (1978); *Cahill,* 659 F.Supp. at 1120–21.

The parties' intention determines the collateral estoppel effect of a consent judgment. *See Universal City Studios v. Nintendo Co.,* 578 F.Supp. 911, 920 (S.D.N.Y. 1983), *aff'd,* 746 F.2d 112 (2d Cir.1984) (citing *Kaspar Wire Works, Inc. v. Leco Engineering & Machine, Inc.,* 575 F.2d 530, 539 (5th Cir.1978) ("If [the parties to a consent decree] have in their compromise indicated clearly the intention that the decree to be

---

**6.** Like Connelly in present case, the plaintiff in *Nemaizer* claimed that his stipulation contemplated dismissal of only state labor law claims and not federal Employee Retirement Income Security Act (ERISA) claims arising out of the same operative facts. The court refused to relieve plaintiff of the consequences of the stipula-

tion pursuant to Fed.R.Civ.P. 60(b) stating, "[t]he legal consequences of a stipulation incorporated in a court order may not be undone simply because, with the benefit of hindsight, stipulating turns out to have been an unfortunate tactic." *Id.* at 59–60.

entered shall not only terminate the litigation but, also, determine finally certain issues, then their intention shall be effectuated."")); *See also Mendez v. Saks & Co.*, 485 F.2d 1355, 1363–64 (2d Cir.1973), *rev'd on other grounds*, 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). The presence or absence of findings of fact accompanying a consent judgment is especially relevant to the determination of the parties' intent with respect to issue preclusion. *Universal City Studios*, 578 F.Supp. at 920 (citing *Lawlor v. Nat'l Screen Service*, 349 U.S. 322, 327, 75 S.Ct. 865, 868, 99 L.Ed. 1122 (1955)).[7]

### 2. Applying the Doctrines
#### (a) The Dismissed Counts

Since the viability of plaintiff's common-law claims depends on the preclusive effect of the September 28 stipulation, the Court must examine each dismissed count in some detail. All three dismissed counts sought identical relief in the form of a declaration, pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, that "GSA's finding of Bernard and Georgia–Pacific as responsible, and GSA's award of a contract to

Georgia–Pacific under the triple wall IFB based on that finding [were] in violation of government procurement laws and regulations." Exh. 21 ¶¶ 72, 77, 83. The individual counts, however, marshalled factual allegations somewhat differently in support of alleged violations of overlapping laws and regulations.

Count I alleged that the defendants' Certificate of Independent Price Determinations violated 48 C.F.R. §§ 52.203–2 & 3.103–1,[8] since Bernard had allegedly induced Georgia–Pacific to bid only on triple wall items to restrict competition among his clients and that Bernard and Georgia–Pacific had engaged "in a pattern of behavior ... to suppress bids, manipulate prices and otherwise restrict competition in violation of 48 C.F.R. §§ 3.103 & 52.203–2 and 41 U.S.C. § 253(a)(1)(A)."[9]

Count II alleged that "the GSA contracting officer's affirmative finding that Georgia–Pacific was a responsible prospective contractor" in the Triple Wall Solicitation violated 48 C.F.R. §§ 9.103 & 9.105–1 and that GSA's award of the contract violated 41 U.S.C. § 253(a)(1)(A).[10]

---

7. In *Universal City Studios*, where the consent decree, like the stipulation in the instant case, made no findings of fact, the court refused to find any collateral estoppel.

8. Section 3.103–1 provides, in relevant part,

> The contracting officer shall insert the provision at 52.203–2, Certificate of Independent Price Determination, in solicitations when a fixed-price contract ... is contemplated....

Section 52.203–2 sets forth the form of the Certificate, which provides, in relevant part:

> (a) The offeror certifies that—
> (1) The prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the method or factors to calculate the prices offered;
> (2) The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening ... unless otherwise required by law; and
> (3) No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

9. 41 U.S.C. § 253(a)(1)(A) reads, in relevant part:

> [A]n executive agency in conducting a procurement for property or services shall obtain full and open competition through the use of competitive procedures in accordance with the requirements of this subchapter and the modifications to regulations promulgated pursuant to section 2752 of the Competition in Contracting Act of 1984....

10. Section 9.103 reads:

> (a) Purchases shall be made from, and contracts shall be awarded to, responsible prospective contractors only.
> (b) No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility. In the absence of information clearly indicating that the prospective contractor is responsible, the contracting officer shall make a determination of nonresponsibility....

.  .  .  .  .

Section 9.105–1 reads:

> (a) Before making a determination of responsibility, the contracting officer shall possess or obtain information sufficient to be satisfied that a prospective contractor currently meets the applicable standards in 9.104.

.  .  .  .  .

Finally, Count III alleged continuing violations of 48 C.F.R. §§ 52.203–2 & 3.103 and 41 U.S.C. § 253, based on Bernard's alleged inducing of two client companies to withdraw protests to a previous GSA determination, his alleged inducing of his client companies falsely to certify that he represented them for both commercial and government contracts, and his representation of multiple companies that allegedly do not bid against each other.

### (b) *The Scope of Preclusion*

Connelly is willing to concede only that it is "precluded forever from alleging that the General Services Administration violated the Administrative Procedure Act in awarding this contract to Georgia–Pacific, based on the record before it at the time." T. at. 13. In Connelly's view, nothing prevents it from challenging the same GSA action based on facts developed before this Court and not available in the administrative record. Defendants, on the other hand, argue that Connelly has stipulated away its right to argue that they violated any federal procurement laws and regulations.

Much of plaintiff's case apparently hangs on the elusive distinction between "claim" and "issue." *See, e.g.*, C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 4402 at 10 (1981) ("The distinction between an issue and a claim is often one of degree and emphasis in applying a deeper principle that an original misadventure cannot be retrieved for a second chance."). Should this Court find that plaintiff stipulated away the entire *claim* that defendants violated the statutory provision and regulations enumerated in Counts I, II and III, under the Second Circuit's generous application of doctrine of res judicata,[11] plaintiff would be bound by its stipulated dismissal with respect to "all relevant issues which could have been but were not raised and litigated" in attempting to show violation of those laws

and regulations. *Nemaizer*, 793 F.2d at 59–60. The preclusion would certainly reach to the facts outside the administrative record alleged before this Court, since Connelly not only might have but actually did raise them in the dismissed counts. If Connelly intended to ground any part of its suit on the violations of 48 C.F.R. §§ 3.103, 9.103, 9.105–1, & 52.203–2 and 41 U.S.C. § 253, the time to do so would have been before dismissing the portion of its complaint alleging violation of those provisions.

If, on the other hand, this Court were to find that the parties stipulated only that the GSA did not violate the procurement laws and regulations in finding Georgia–Pacific responsible and in awarding it the contract, plaintiff would be free to argue that defendants are nevertheless liable under the common-law claims for violating the same law and regulations, since Connelly could hardly have intended to stipulate away the balance of its case in dismissing the Government.[12]

■ Unfortunately, the legal doctrines of claim and issue preclusion do not display the coherence that one would desire and their applicability in this case is far from clear. Nevertheless, after careful scrutiny of relevant authority, this Court finds that the doctrines of issue and claim preclusion do not bar Connelly from resting its common-law claims on alleged violations of federal procurement laws and regulations. The Court finds that Connelly did not stipulate away its right to argue that the remaining defendants violated *any* federal procurement laws and regulations. In so far as intent is relevant in applying the doctrine of claim preclusion, the Court finds that defendants clearly intended only to stipulate that the GSA did not violate procurement laws and regulations. Defendants' plan to file an Amended Complaint asserting common law claims against the remaining defendants was made quite evident.

---

**11.** Under the "flexible" privity requirement applicable in this Circuit, *Amalgamated Sugar Co.*, 825 F.2d at 640, Bernard and Georgia–Pacific are surely privies of GSA for the purposes of res judicata in the factual context of this case, since they were parties to the stipulation and since

their conduct was the real object of plaintiff's challenge of the GSA.

**12.** Under *Nemaizer*, intent is, of course, irrelevant to claim preclusion.

In *Montana v. United States*, 440 U.S. at 154–55, 99 S.Ct. at 974, the Supreme Court described the purpose of the doctrines of claim and issue preclusion: "To preclude parties from contesting matters that they have had a full and fair opportunity to litigate protects their adversaries from the expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id.* (footnote omitted). The present decision does no violence to any of these policies. First, since this motion does not concern matters that have been fully litigated, but rather concerns the scope of a stipulation, there is no danger of duplication of litigation. Second, this case involves a single judicial proceeding and presents no danger of multiple suits. Had Connelly chosen to leave the counts against the Government in abeyance rather than to dismiss them, it would not now be facing this problem. To endow the dismissal of a party with preclusive effects fatal to the claims against other parties would only needlessly discourage plaintiffs from dismissing any party early in a case, even after it becomes obvious that no useful remedy is available as against that party, and would represent an unwanted triumph of form over substance. Finally, defendants cannot plausibly invoke the threat of inconsistent judgments, since they clearly knew that plaintiff intended to pursue Counts IV, V and VI after the stipulation.

Accordingly, the Court finds that plaintiff's common law claims are not fully barred by issue or claim preclusion.

## B. The Common–Law Claims

Plaintiff argues that, even if the GSA did not err, as far as the government is concerned, in finding the defendants responsible and in awarding the contract to them, it may nevertheless recover damages by showing that defendants' actions in securing the contract were unjust or tortious as measured, in part, by the same federal procurement laws and regulations. *Cf. Iconco v. Jensen Const. Co.*, 622 F.2d 1291 (8th Cir.1980). Defendants contend that plaintiff has failed to introduce sufficient evidence to raise a genuine issue of fact on these claims and, thus, this Court should grant summary judgment in defendants' favor.

Fed.R.Civ.P. 56(c) requires a party moving for summary judgment to show "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as matter of law." The moving party bears the initial burden of demonstrating that no genuine issue of fact exists. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The party opposing summary judgment must then point to evidence that a genuine issue of fact does exist. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In doing so, the nonmoving party may not rely simply "on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment." *Knight v. U.S. Fire Insurance Co.*, 804 F.2d 9, 12 (2d Cir.1986), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). And where the nonmoving party bears the burden of proof, that party must show specific facts warranting a trial. As the Supreme Court has explained, "[W]e do not think ... that the burden is on the party moving for summary judgment to produce evidence showing the absence of a genuine issue of material fact, even with respect to an issue on which the nonmoving party bears the burden on proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986).

Moreover, if the evidence supporting the nonmoving party's claims is meager, the moving party may simply point "out to the district court that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp.*, 477 U.S. at 325, 106 S.Ct. at 2553. Sworn affidavits in opposition to a summary judgment motion must "set forth such facts as would be admissible in evidence ..." Fed.R.Civ.P. 56(e). The court must believe the non-movant's evidence and draw all inferences in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513 (citing *Adickes v. S.H. Kress & Co.*,

398 U.S. 144, 158–59, 90 S.Ct. 1598, 1608–09, 26 L.Ed.2d 142 (1970)). However, "if the factual context renders [plaintiff's] claim implausible—if the claim is one that simply makes no economic sense—[plaintiff] must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Applying these standards, the Court finds that plaintiff has failed to set forth facts of sufficient caliber or quantity to raise a genuine issue of material fact and, thus, summary judgment is warranted.

### 1. Unjust Enrichment

In an action for unjust enrichment or restitution, the essential inquiry under New York law, as articulated by the Court of Appeals in *Paramount Film Distributing Corp. v. State of New York*, 30 N.Y.2d 415, 421, 334 N.Y.S.2d 388, 393, 285 N.E.2d 695, 698 (1972), is:

> whether it is against equity and good conscience to permit the defendant to retain what is sought to be recovered. Such a claim is undoubtedly equitable and depends upon broad considerations of equity and justice. Generally, courts will look to see [ (i) ] if a benefit has been conferred on the defendant under mistake of fact or law, [ (ii) ] if the benefit still remains with the defendant, [ (iii) ] if there has been otherwise a change of position by the defendant, and [ (iv) ] whether the defendant's conduct was tortious or fraudulent (Restatement, Restitution, §§ 1, 142, esp. Comment b; id., § 155, including Comment b).

(citations omitted).

■ Defendants initially argue that they cannot be liable under a theory of unjust enrichment, because they received no benefit *directly* from Connelly. This contention tries to draw too fine a line for an equitable remedy such as unjust enrichment. In

*Eightway Corp. v. Dime Savings Bank of Williamsburg*, 94 Misc.2d 274, 404 N.Y.S.2d 302 (N.Y.Civ.Ct.1978), *aff'd*, 99 Misc.2d 989, 420 N.Y.S.2d 836 (1979), the court granted restitution to plaintiff for taxes mistakenly paid out of his mortgage escrow account by defendant bank after defendant buyer purchased the property, stating:

> It is not necessary in order for plaintiff to prevail, to show that it paid the money, which it seeks to recover, directly to the buyer. It is sufficient if another party, in this case, the bank, took certain action—the payment of taxes—which gave the buyer this direct benefit.

*Id.*, 404 N.Y.S.2d at 306 (citation omitted).[13] *See also Iconco v. Jensen Const. Co.*, 622 F.2d 1291 (8th Cir.1980) (second lowest bidder on a government contract permitted to recover for unjust enrichment under Iowa law against lowest bidder who had falsely certified that it was a small business under federal law and had been awarded the contract on that basis); *Fordice Construction Co. v. Central States Dredging Co.*, 631 F.Supp. 1536 (S.D.Miss.1986) (similar). The lack of a direct transfer from plaintiff to defendant thus does not bar recovery for unjust enrichment.

Plaintiff alleges that defendants undertook numerous forms of "unjust and inequitable behavior." In determining whether plaintiff has raised a genuine issue of material fact regarding any such bases, the Court will examine each in turn.

#### (a) Use of Fixed Cost Information from Other Clients

Connelly alleges that Bernard used confidential cost information obtained from his other clients, all single- and double-wall manufacturers, to compute bid prices for Georgia–Pacific's triple-wall bids, which would give Georgia–Pacific an advantage against Connelly in computing successful bid prices.

---

**13.** Defendants' attempt to distinguish *Eightway* on the basis of the court's observation that "the significant fact is that the buyer received a direct benefit when taxes owning on its property were paid by funds supplied by plaintiff," *id.* 404 N.Y.S.2d at 307, is unconvincing: Bernard and Georgia–Pacific too received *direct* payment from the government under the contract that Connelly claims should have been awarded to it.

Nowhere in its pleadings, in its memoranda, or during oral argument, did plaintiff, however, explain how access to other companies' overhead costs could have helped Bernard bid against Connelly. According to the President of Connelly, Thomas S. Connelly, "if [a manufacturer] knows its *competitors'* overhead costs at the time it is preparing a bid, that manufacturer would have an enormous advantage in determining what would likely be a successful bid." Connelly, Aff. ¶ 3 (emphasis added). Moreover, overhead cost is the second largest variable (after freight costs) among the components of a bid. *Id.* Thus defendants would have had to have access to *Connelly's* overhead costs to be in a better position to underbid Connelly. The high variability of overhead costs militates against the possibility of deriving Connelly's overhead costs from mathematical manipulation of the overhead costs of third-party companies.

■ Given the "implausibility" of this component of plaintiff's case, plaintiff has a somewhat greater burden to bear in withstanding a motion for summary judgment. *Matsushita*, 475 U.S. at 574, 106 S.Ct. at 1348. The only specific evidence that plaintiff has introduced in support of its contention that Bernard and Georgia–Pacific had access to other companies' cost information is, however, a statement from Bernard's deposition in which he stated that he did not use publicly available cost information to compute the bids that he prepared for Georgia–Pacific. Bernard Dep. at 124. From this statement and in spite to Bernard's specific denials, *see* Bernard Dep. at 118–19, plaintiff surmises that Bernard must, therefore, have used confidential and proprietary information to compute the bids. Such evidence, which is ambiguous at best, cannot sustain plaintiff's burden.

(b) *Abstention from Bidding on Other Products*

■ Connelly further alleges that Georgia–Pacific consciously decided to bid exclusively on triple-wall products when it was capable of bidding on other items, since Bernard had committed himself to bidding

on other items for his other clients and Georgia–Pacific wanted to preserve its relationship with Bernard because of his access to confidential cost information and favorable freight rates.

Georgia–Pacific has introduced deposition testimony of officers of its Canton plant setting forth various grounds for their decision to bid only on triple-wall contracts. The plant's business plan called for expansion of triple-wall sales. McClintock Dep. at 54; Adams Dep. at 15–16. The profit margins on single- and double-wall were too meager to offset the "the aggravations of red-tape, complicated procedures and delays that come with dealing with the government on sale of those products, particularly where product has to be shipped long distances." McClintock Aff. ¶ 7; McClintock Dep. at 19. Certain government solicitations required special grades of paper, special widths, and special liner that the plant did not carry. McClintock Dep. 24, 56–57. Moreover, McClintock specifically stated that Bernard never asked him to abstain from bidding on items other than those which Bernard suggested. McClintock Dep. at 63.

Plaintiff, for its part, has come forth with no specific evidence that Bernard requested Georgia–Pacific to refrain from bidding on single- and double-wall or that Georgia–Pacific conformed to any such request. Instead, plaintiff rests its case on the fact that the Canton plant could have produced some of the single- and double-wall products, on the proposition that selling a product with *any* profit margin is always worthwhile, and on the logical consistency of defendant's conduct with its conspiracy theory. As illustrated by defendants' evidence, their failure to bid is, of course, equally consistent with proper and rational business conduct.

Plaintiff has thus failed to carry its burden of introducing sufficient specific evidence to withstand a motion for summary judgment with respect to this allegation.

(c) *Violation of Procurement Laws and Regulations*

Plaintiff further cites violations of several federal procurement regulations as instances of unjust conduct by defendants.

Plaintiff claims that defendants' alleged access to competitors' cost information and improper abstention from bidding on certain items also violates the Certificate of Independent Price Determination. In light of the Court's findings with respect to the alleged conduct, this additional claim based on the same conduct obviously must fail.

Plaintiff then alleges that the GSA ought to have found Georgia–Pacific nonresponsible based on its having found Bernard nonresponsible in a prior solicitation. The GSA rejected precisely this argument in its response to Connelly's protest. Even in the narrowest view of the preclusive effect of plaintiff's dismissal of Counts I, II and III, the stipulation unquestionably bars litigation of this issue, which goes to the propriety of the GSA's original decision.

Finally, plaintiff alleges that Georgia–Pacific mislead the GSA by falsely certifying on its Standard Form 119 that Bernard represented it on both governmental and commercial contracts and that this misrepresentation materially affected the GSA's decision to find defendants responsible. However, the government contracting officers who made the responsibility determinations have declared that their determination would not have been different had they known that Bernard represented Georgia–Pacific exclusively on governmental contracts. Hamilton Aff. ¶ 3; Levy Aff. ¶ 4. Even if the dismissal of the counts against the GSA did not preclude consideration of this issue, the misrepresentation is certainly not an example of the kind of unjust conduct that a court should in equity redress.

### 2. Tortious interference with prospective business relationship

Based on the first two allegations of misconduct that underlie its claim for unjust enrichment, plaintiff also seeks to recover under a theory that defendants tortiously interfered with its prospective economic relations with the GSA. Given the

Court's determination that plaintiff has failed to sustain its evidentiary burden with respect to the underlying conduct to withstand summary judgment, this count, like the unjust enrichment claim, must also fail.

### C. Plaintiff's Request for Additional Discovery

■ Plaintiff has requested that, in the event that this Court finds that plaintiff has failed to demonstrate the existence of disputed issues of material fact sufficient to withstand summary judgment, the Court should refuse the application for judgment or order a continuance to permit further discovery pursuant to Fed.R.Civ.Proc. 56(f).[14]

First, plaintiff seeks discovery of the trucking companies with whom Bernard dealt "to obtain further confirming evidence that Bernard bargained with them for favorable freight rates based on the cargo volumes he controlled at [sic] a result of his representation of multiple bidders." P.Mem. at 66. Since Bernard has not denied negotiating such discount rates, further evidence would not advance plaintiff's case. Indeed, the Court is unaware of any law or regulation that prohibits volume discounts.

Second, plaintiff seeks discovery of Stuart Young, the GSA official who prepared the legal brief accompanying the GSA's report to the General Accounting Office in a previous protest to Bernard's responsibility, to obtain evidence concerning the connection between the withdrawal of protests by two of Bernard's other clients and an alleged decision by the GSA not to proceed with an investigation into Bernard's activities. Since such evidence could only go to challenges to the GSA decision, which plaintiff is now barred from asserting, this evidence would likewise not advance plaintiff's case.

Finally, plaintiff seeks discovery of other companies represented by Bernard "to ob-

---

**14.** Fed.R.Civ.P. 56(f) states: "Should it appear from the affidavits of a party opposing the motion that he cannot for reasons stated present by affidavit facts essential to justify his opposition, the court may refuse the application for judg-ment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just."

tain evidence of the nature of Bernard's services, including his role in setting the prices bid on the sheet IFB [,*i.e.*, a previous solicitation,] the cost and pricing information discussed with them, and the methodology used to calculate their bids." *Id.* Such evidence would apparently go to supporting Connelly's allegation that Bernard used the cost information of competing clients to calculate bids for Georgia–Pacific. As discussed above, access to such cost information could not possibly have helped defendants underbid Connelly in the Triple–Sheet Solicitation. Moreover, plaintiff has failed to present the least bit of convincing evidence that defendants did, in fact, use competitors' cost figures in computing bids. The Court, therefore, believes that any further discovery would be futile and would not alter the outcome of this motion.

Since there is absolutely no basis to permit plaintiff to cast its line on a fishing expedition, this Court denies plaintiff's request for additional discovery.

### III. Conclusion

Accordingly, the defendants' motion for summary judgment is granted in its entirety and plaintiff's request for additional discovery is denied.

SO ORDERED.