**Angelina S. BARRIOS, Guilliam Nel, DC et al., on behalf of all persons similarly situated, and derivatively on behalf of Paco Development Partners II, Plaintiffs,**

v.

**PACO PHARMACEUTICAL SERVICES, INC., Paco Technologies, Inc., and Dean Witter Reynolds, Inc., Defendants.**

**Nos. 90 Civ. 2404(MP), 90 Civ. 7916(MP).**

United States District Court, S.D. New York.

March 29, 1993.

Bijan Amini, New York City (Karl Stoecker, Beigel & Sandler, New York City, of counsel), for plaintiffs.

John J. Kenney, New York City (Michael J. Crane, Wendy L. Bruneau, Simpson, Thatcher & Bartlett, New York City, of counsel), for defendants Paco Pharmaceutical Services, Inc. and Paco Technologies, Inc.

## OPINION

### (Amended)

MILTON POLLACK, Senior District Judge:

### I. *Overview*

Two actions against the same defendants asserting federal securities and pendent state-created claims were consolidated for pretrial purposes. As a result of motions by defendants for summary judgment a number of separable claims and parties plaintiffs were severed from the suits and dismissals were entered as final judgments thereon pursuant to Rule 54(b) F.R.C.P.

The remainder of the motions relates to the claim of federal securities fraud pursuant to section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5 promulgated thereunder as well as pendent state claims against the remaining defendants Paco Pharmaceutical Services, Inc. and Paco Technologies, Inc.

As will be shown hereafter, plaintiffs have failed to point to and introduce sufficient evidence to raise a genuine issue of material fact for a jury to decide. Consequently, the pending motion addressing alleged federal fraud by the remaining defendants will be granted and the actions thereon will be dis-

missed, with prejudice, and the pendent state claims against said defendants will be dismissed, without prejudice since no federal claim will remain to which the state claims are pendent.

## II. *Factual Background*

These lawsuits arise from a private placement of limited partnership interests in Paco Development Partners II ("PDP II") created by Paco Pharmaceutical Services ("Paco") to engage in the research and development of transdermal and ophthalmic pharmaceutical products. Paco was an established, publicly traded company until the purchase of all of Paco's common stock in a publicly disclosed transaction in which Paco was merged into a wholly-owned subsidiary of Scherer. Scherer, originally named as a defendant, was not a party to any agreement with the investors and was dismissed from the suit by consent.

Products, if successfully developed by PDP II, were to be marketed following approval by the Food and Drug Administration (the "FDA"). The investors would then be entitled to royalties based upon sales of the products. Five hundred and seventy-seven investors purchased limited partnership interests in PDP II for $25,000 or $50,000, investing a total of $25 million. Seventy-three investors asserted claims singly or jointly with spouses in the two actions referred to above.

Paco Technologies, Inc., (Paco Tech) was the general partner of PDP II. Paco, the corporate parent of Paco Tech, provided a wide range of services to leading pharmaceutical companies, such as manufacturing sterile products and tamper-evident packages, and filling packages with products for customers. Paco Research Corporation, also a wholly-owned subsidiary of Paco, was to conduct PDP II's research and development activities.

Dean Witter was the placement agent that prepared and issued, on September 22, 1986, a so-called Confidential Private Placement Memorandum (PPM) and an Investment Guide which was distributed to potential investors. Dean Witter worked with a regional investment banking firm—First Albany—and hired Bogart Delafield Ferrier ("BDF"), a renowned firm, to serve as technical consultant. BDF prepared a report that was appended to the PPM. Dean Witter had previously placed two other drug partnerships, Nova and Ares–Serono, for which BDF had also served as consultant.

Due to the high cost and speculative nature of the investment, sales were limited to wealthy investors who satisfied specific and rigid financial requirements. Each investor was required to demonstrate a net worth (or joint net worth with the investor's spouse) exceeding $1 million at the time of the investor's purchase. PPM at 10. In the alternative, an investor needed to demonstrate that he had an individual income (exclusive of the investor's spouse's income) "in excess of $200,000 in each of the two most recent years and who reasonably expects an income in excess of $200,000" in 1986, the year of the offering. PPM at 10.

The PPM further explained that prospective investors in some states may be required to represent in writing additional facts relating to net worth, sophistication in investment matters and access to investment advice. PPM at 10. The PPM warned prospective investors that *even if* they satisfied the financial requirements, they should still consult with their personal advisers to determine whether this risky investment was suitable given each potential investor's personal circumstances. PPM at 11.

Each plaintiff signed a subscription agreement warranting that he or she "relied solely" on the information contained in the PPM, or answers to the investors' questions of Paco or Paco Technology and "has not been furnished with any oral representation, warranty or information in connection with the offering of the units by Paco, General Partner, the Partnership, the Placement Agent, or any Selected Dealer, or any officer, employee, agent, affiliate or subsidiary of any of them."

The PPM abounded with warnings of the risky nature of an investment. The inside cover of the PPM bluntly stated, **"Investment in the Units offered hereby involves a high degree of risk. No person should invest in the Units who is not in a position to lose his entire investment."** PPM at

Inside Cover. This admonition was reiterated immediately after the PPM's table of contents and before any description of the venture. PPM at ii. Additional warnings and deterrents to investment addressing numerous specific risks were contained throughout the PPM. These "RISK FACTORS" were summarized for prospective investors intent on a risky speculation at the outset of the offering memorandum:

"Prospective Investors should consider various risks associated with an investment in the Partnership and, through the Warrants, in Paco, including but not limited to the following:

* Uncertainties associated with research and development activities

* Potential need for funds in excess of those available to the Partnership

* Difficulties associated with obtaining patent protection, maintaining trade secrets of licensing technology patented by others

* Tax risks

* Competition and uncertain marketability of Products

* Risk that Paco will not exercise the Purchase Option

* Uncertainty of timely governmental regulatory approval

* Possible product liability

* Limited liquidity ..."

PPM at 2–3. An eleven-page section of the PPM entitled **"Risk Factors"** expanded on these warnings. PPM at 34–44. The prospective investors were explicitly warned that,

* the products were undeveloped or at a preliminary stage of development (PPM at 34);

* there was no assurance that the products would be successfully developed, manufactured or marketed (PPM at 34);

* there was no assurance that the appropriate scientific and technical personnel could be recruited (PPM at 36);

* there was no assurance that the sales and marketing force necessary to achieve the sales contained in financial projections would be established (PPM at 34);

* there was no assurance of timely governmental regulatory approval (PPM at 36).

Further cautionary language *preceded* the "Potential Returns to Limited Partners" attached as Exhibit G to the PPM. Here, potential investors were advised that,

* the financial model containing the potential returns "is intended only as a mathematical illustration of the assumptions stated herein...." (PPM at G–1);

PROSPECTIVE INVESTORS ARE ADVISED THAT WHILE THE [FINANCIAL] MODEL WAS PREPARED ... ON THE BASIS OF CERTAIN ASSUMPTIONS WITH RESPECT TO THE PRODUCTS THAT [PACO AND PACO TECH] BELIEVE TO BE REASONABLE, NO REPRESENTATION IS MADE OR SHOULD BE INFERRED WITH RESPECT TO THE ACCURACY OR COMPLETENESS OF THE MODEL, THE UNDERLYING ASSUMPTIONS, OR ANY OTHER ECONOMIC MATTERS REFERRED TO HEREIN. (PPM at G–1).

\*   \*   \*   \*   \*   \*

IF THE PARTNERSHIP DOES NOT DEVELOP ANY NEW TECHNOLOGIES OR PRODUCTS, THE PRODUCTS ARE NOT DEVELOPED AT THE TIMES OR COSTS ANTICIPATED HEREIN OR THE PRODUCTS CANNOT BE PRODUCED OR CANNOT BE SOLD IN THE QUANTITIES OR FOR THE PRICES ASSUMED HEREIN AND, FURTHER, IF THE TAX TREATMENT ASSUMED HEREIN IS NOT AVAILABLE, THERE MAY BE A MATERIALLY ADVERSE EFFECT ON THE HYPOTHETICAL ECONOMIC BENEFITS SET FORTH IN THE FOLLOWING MODEL AND ON THE BENEFITS AN INVESTOR MAY DERIVE FROM HIS INVESTMENT.

\*   \*   \*   \*   \*   \*

INVESTMENT IN THE PARTNERSHIP IS SPECULATIVE AND INVOLVES A HIGH DEGREE OF RISK. THERE CAN BE NO ASSURANCE THAT THE PARTNERSHIP WILL

SUCCESSFULLY DEVELOP NEW TECHNOLOGIES OR PRODUCTS

. . . .

Each plaintiff certified in the Subscription Agreement and Investment Representation (the "Subscription Agreement") that he/she had read the PPM and of his/her awareness that,

* PDP II had been recently organized and did not have a financial or operating history (Subscription Agreement § 3.2(c), Subscription Documents at 7);

* "There are substantial risks of loss of investment incident to an investment in the Units, the Limited Partnership Interests or the Warrants including those summarized under "Risk Factors" and in other portions of the [PPM];" (Subscription Agreement § 3.2(c), Subscriptions Documents at 7);

* "All potential returns to limited partners set forth in the [PPM] are based on various estimates and forecasts of the General Partner and the Partnership and are subject to the risks, assumptions and caveats set forth in the [PPM];" (Subscription Agreement § 3.2(f), Subscription Documents at 7).

The *Barrios* case was filed in this Court on April 9, 1990 and the complaint in that action has been amended three times. Additional plaintiffs were added with each amendment. The *Nel* case was filed on December 11, 1990 and the complaint in that case has been amended twice. With the exception of the § 10(b) claims which are asserted only in *Barrios*, the claims set forth in each complaint were the same. Plaintiffs alleged that the Paco Defendants violated RICO (the RICO claim was later dismissed, on consent) and that the defendants committed common law fraud and negligent misrepresentation in offering the Units, that they breached their fiduciary duties to the investors, and breached a contract to issue Warrants.

### III.

*The Advent of the Experts on the Motion*

It was only when plaintiffs served their untimely opposition to the summary judgment motions that they unveiled two experts as witnesses in these cases to supplement conclusory affidavits in the opposing papers. The experts were belatedly revealed three weeks after the close of discovery ordered by the Court. Even so, it seemed that the affidavits of these experts did nothing more than raise a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Added to the uncertainty of the affidavits submitted opposing the motions for summary judgment, it became evident that plaintiffs attempted to utilize an expert to explicate matters which would offset the warnings of the PPM to investors. The plaintiffs contended that there was a genuine issue of material fact concerning "the reasonableness" of the defendants' projections and development plans regardless of the warnings and disclosures in the PPM.

The Court granted the plaintiffs the opportunity to present their expert witnesses in a hearing pursuant to F.R.C.P. 43(e) to determine, if indeed, triable issues of fact exist. The scope of this hearing was limited only to that determination. It was not intended to invoke a test of credibility or a resolution of disputed opinions. *See Argus, Inc. v. Eastman Kodak Co.*, 612 F.Supp. 904 (S.D.N.Y. 1985), *aff'd*, 801 F.2d 38 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1295, 94 L.Ed.2d 151 (1987). Laying aside whether federal fraud is established on the basis of "reasonableness," rather than intent to deceive, the plaintiffs submitted as proof in the course of the testimony only a professional critique of Paco's procedures and estimates— no intent to deceive was shown or inferable.

When reduced to their essentials, the experts made four contentions:

* the Paco Defendants lacked sufficient staff to complete PDP II's research and development activities

* insufficient time was allotted for use in the research and development process

* the regulatory approval process would take longer than that which was anticipated

* the research and development budgets were inadequate

However, plaintiffs did not dispute the fact that they received specific warnings on each of these subjects in the PPM and also received an overarching warning concerning all assumptions, contained in Exhibit G to the PPM, which after explicit warnings against reliance on the financial assumptions sets forth "Potential Returns to Limited Partners."

The plaintiffs presented as an expert witness at the Rule 43(e) hearings, Dr. Bernard Cabana, the holder of a Ph.D. with an impressive background in pharmaceutical development and FDA procedure.

The testimony of this expert revealed only a professional critique of Paco's procedure and estimates—no intent to deceive was shown or inferable, viz., a difference of professional opinion from that of defendants' experts; an inadequate knowledge on the part of Dr. Cabana of the actual program and procedures of Paco; a mistaken reliance on a document as Paco's program, which was not the program; and that the significant criticisms levelled at the program had been adequately addressed by the warnings of the risks set out in the PPM.

Dr. Cabana testified that he had read the PPM and "some" deposition transcripts, but did not meet to speak with any of the individuals who worked on the PDP II project. Although PDP II planned to develop *seven* transdermal drug delivery systems and *30* eye-care products, Dr. Cabana testified that he only reviewed PDP II's plans for two drugs in great detail, had reviewed the plans for three drugs in less detail and did not review the plans for one drug at all because it was not mentioned in a particular exhibit he reviewed.

Dr. Cabana acknowledged that he could have master-minded the development task more effectively. He testified that he would not have created the same budgets and timelines as the Paco defendants, and that he characterized the PDP II program as fashioned by Paco's experts as "unrealistic." Of two of the three research phases for the transdermal drugs, he testified, "I don't agree with their plan but that is their plan."

The witness testified extensively to his critique of the judgment of Paco's employees, although he claimed not to "know the motives involved." Dr. Cabana did not testify as to any facts that indicated improper motivation or anything resembling fraud by the defendants. In fact, he testified that he did not question their "integrity", "but I definitely will question their ability." "I believe that I would have used a different approach to evaluating and would have ended up with a different result," he said. Most important, Dr. Cabana's testimony did not illustrate any substantive *factual* disputes.

Dr. Cabana speculated, years after the project was launched, and without ever talking to the people involved or even reviewing all of their depositions, that the Paco experts left tests and other elements out of their program, apparently ignoring good advice concerning FDA regulations or the regulations themselves. However, Dr. Cabana could find no reasons why the defendants would do so, although at one point he ventured the speculation that a key PDP II employee simply "did not know the food and drug regulation."

Dr. Cabana was unable to specify whether he was substituting his opinion about what the FDA would do if presented with an application for approval of PDP II products, or whether there were specific applicable requirements, each of which necessarily would have to be satisfied for approval of these drugs. When asked, he could not provide a citation to any such FDA regulations.

The fact that certain steps are absent in the PDP II program is not in dispute. But Dr. Cabana admitted he has no question about the professional standing of the various persons who served Paco and laid out their programs.

The following colloquy is illustrative:

The Court: May I just ask this one question? Thus far, all morning we have been engaged in listening to your opinion of the inaccuracies of the Development Plan used by Paco II, is that correct?

The Witness: That's correct.

The Court: All right. That summarizes everything that you've been talking about, inadequacies in your opinion?

The Witness: In my opinion.

After indicating on the record that Ms. Ellis (Paco's expert) was recommending to her client that literature be depended on for the pharmacologic evidence and conceding "there is obviously a difference of opinion," the witness answered that

You asked me a very important question the last time, and I wrestled with it. How do I know the quality, am I looking at the quality of these people or are they trying to commit fraud? I've never asked these people, I asked myself is there reasonable doubts? Is it only an opinion? Or are they giving facts. Now I could differ, I could differ in my opinion concerning Hanni Ellis. I could differ with Mr. Tupa. Where I have difficulty is when the FDA issues letters to the Paco representatives and they ignore or do not appear to address that, then I have serious difficulties.

The Witness: I don't know why the Court—reacted that way.

The Witness: That's correct. I don't know why.

The Court: And you also don't know very much about Dr. Kim in the first place?

The Witness: That's correct.

The Court: So you, that you haven't examined all the parameters of what might have gone through the minds of these people at the time other than in your own profound opinion you think things should have been done your way, isn't that correct?

The Witness: No, the way the FDA proposes.

The Court: In other words, you tied yourself to the flag. You think that's the way they should have acted.

The Witness: They should have.

The Court: But you don't know the basis on which they did act do you?

The Witness: That's correct.

Bogart Delafield Ferrier, (BDF), an independent outstanding consulting firm specializing in planning in the pharmaceutical and drug industries was retained by the Placement Agents to provide an assessment of the technical and commercial risks of the Projects and the overall potential returns of the Products reported on August 18, 1986, *inter alia* (set forth in the PPM):

Historically, Paco has been a strong, operations-driven company with excellent manufacturing and development facilities. It is our opinion that ... [the program] is an aggressive and attractive combined program that is generally supported by sound scientific, technical, marketing, and business strategies.

\*     \*     \*     \*     \*     \*

[W]e are persuaded that Paco has the necessary product development and manufacturing skills in place to support the goals of the proposed Partnership projects. While Paco presently has limited marketing capabilities, over the next few years the company plans to develop a marketing organization with the capabilities and resources to effectively market the proposed Partnership products.

\*     \*     \*     \*     \*     \*

The risks of exceeding the time schedules and budgets are, in our opinion, no more but no less risky than those occurring in comparable industry development programs.

The PPM carefully warned all who would read it that the cautionary language spoke only in future projections by specific warnings of significant risk factors and the disclosure of underlying factual assumptions. The hearing held to explore and supplement the blurred affidavits on summary judgment presented no evidence from plaintiffs of any misrepresentation of Paco's personnel, equipment, research abilities, technology, and its past performances. It would have made no sense to have engaged an outstanding consultant firm like BDF and fail to include its critique of the project in the PPM and express their opinion thereon. Plaintiffs failed to adduce the existence of any evidence contradicting that critique, choosing merely to rest on contrary conclusory assertions of their lawyers, not evidence.

In the face of the content of the PPM, no potential investor was at liberty to conclude to the contrary of or to ignore the specifics of what was stated and represented, and believe that an investment was being made in an assured project—rather than in the candidly disclosed risky and precarious investment set forth. It was expressly stated that there was no assurance that the investment objectives of the partnership would be realized. The economic projections were cloaked in express warnings that they were entirely speculative; they are not actionable, because they bespeak caution in precise language and specifically disclose the nature and extent of the risks involved.

### IV.

*The Consent Eliminating Dean Witter from the Actions.*

The complaint, as filed and amended, asserted claims under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, as well as claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961, 1962(c) and (d), to which plaintiffs had annexed, under alleged pendent jurisdiction, a number of state law causes of action. It was alleged that Paco and defendant Dean Witter Reynolds, Inc. ("Dean Witter") structured the investment involved herein and created the plan and made the representations relied on by plaintiffs; that the defendants were aware at the time of the offering that the assumptions underlying the projections were wholly without basis and that PDP II's products could not be developed with the time and money budgeted; that Dean Witter and its consultant confirmed that a 40% internal rate of return was reasonable and achievable; that they had conducted a thorough and independent evaluation of the merits of PDP's proposed research plan and confirmed that projection of returns to limited partners were reasonable and achievable, conservative and realistic; that Dean Witter had no basis for those conclusions; and that defendants Paco and Dean Witter withheld critical information about the research program from the R & D contractor who was engaged to conduct re-search; that defendants conspired to conceal their fraud; that quarterly reports misrepresented the progress made on the program; that the defendants, including Dean Witter, discussed the information to be reported to plaintiffs and misrepresented the actual progress; that Paco and Dean Witter had conspired in violation of RICO in the alleged frauds; and that the defendants had agreed to participate in a pattern of activity in violation of RICO.

Pressed to furnish specifications and particulars of the 10b and RICO charges, during the pendency of the summary judgment motions, the plaintiffs moved for a dismissal of the federal claims against Dean Witter at the hearing before the Court held on December 17, 1992 pursuant to Fed.R.Civ.P. 43(e) and with Dean Witter's consent the court signed a Final Order and Judgment which provides:

WHEREAS, plaintiffs have requested an order dismissing the federal claims asserted against defendant Dean Witter Reynolds, Inc. ("Dean Witter") in the Consolidated Amended Complaint;

WHEREAS, the Court having found that all the federal claims asserted against Dean Witter in the Consolidated Amended Complaint should be dismissed upon plaintiffs' application;

WHEREAS, the Court, in the exercise of its discretion, has determined that it will decline to exercise jurisdiction over the pendent state law claims;

WHEREAS, the court finds, pursuant to Federal Rule of Civil Procedure 54(b), that there is no just reason for delay, it is hereby

ORDERED AND ADJUDGED, that (1) all federal claims in the Consolidated Amended Complaint against Dean Witter are hereby dismissed on consent, with prejudice; and (2) the court, in its discretion, declines to exercise jurisdiction over the pendent state law claims in the Consolidated Amended Complaint and accordingly, those claims are hereby dismissed. There being no just reason for delay, the Clerk is hereby directed to enter final judgment herein pursuant to Rule 54(b).

The stipulation made and entered on the record in open Court was as follows:

THE COURT: ... Both counsel have now agreed on the form of the order and [plaintiffs' counsel] has agreed on the substance of the order. Is that correct?

[PLAINTIFFS' COUNSEL]: That's correct your honor.

[DEAN WITTER'S COUNSEL]: I trust the record is clear, your honor, that we respectfully disagree with your Honor's decision not to go forward with the remaining [pendent] claims?

THE COURT: Your exception is noted.

[DEAN WITTER'S COUNSEL]: Thank you.

THE COURT: I will now sign the order.

Transcript of December 17, 1992, Hearing at 123.

## V.

### The Paco Defendants Are Entitled to Summary Judgment on the Federal Securities Claim

The federal RICO claim against the Paco defendants was orally ordered to be dismissed during a session of Court and an Order entered on January 23, 1993 dismissing with prejudice the claims against Paco defendants of certain named plaintiffs as barred by applicable statutes of limitation also included an Order dismissing, with prejudice, all claims against Paco defendants under the RICO statute as theretofore ruled in open Court. Those orders have become final judgments pursuant to Rule 54(b) F.R.C.P. The state law pendent claims against the Paco defendants were also dismissed, but without prejudice, in the exercise of discretion of the Court.

All federal claims against defendant Dean Witter, on request of the plaintiffs, consented to by Dean Witter, were dismissed with prejudice, by Order and Final Judgment entered on December 17, 1992, as set forth above. The pendent state law claims against Dean Witter were dismissed without prejudice.

### a. The Federal Securities Claims Against Paco Defendants

The warnings in the PPM and disclosures of the risks of the enterprise were sufficient to and do defeat the federal securities fraud claims. It is true that caveats about the projections of the enterprise do not insulate the Paco Defendants from fraud. However, it is well settled in this and a number of other jurisdictions that future presentations such as contained in the PPM are not statements of material fact on which an investor can rely. By their very content those projections cannot be converted from risks that bespeak caution into material facts, and they are not actionable. *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir.1986); *CL–Alexanders Laing & Cruickshank v. Goldfeld*, 739 F.Supp. 158, 162 (S.D.N.Y.1990); *see also In re Donald J. Trump Casino Sec. Litigation*, 793 F.Supp. 543, 549–52 (D.N.J. 1992) (indicating how virtually every circuit has come to agree with the "bespeak caution" principle in the law).

> The essence of the doctrine is that where an offering statement, such as a prospectus, accompanies statements of its future forecasts, projections and expectations with adequate cautionary language, those statements are not actionable as securities fraud. Within the past thirteen months, five circuit courts have adopted this approach to evaluating the actionability of a federal securities fraud claim based on future projections contained in a prospectus or other offering statement.

*Trump Casino*, 793 F.Supp. at 549.

> [C]ourts in this Circuit have repeatedly held that, with respect to future projections, there is no liability under § 10(b) for statements in an offering memorandum that "bespeaks caution."

*Haggerty v. Comstock Gold Co.*, 765 F.Supp. 111, 114, *reh'g denied*, 770 F.Supp. 216 (S.D.N.Y.1991) (Leisure, J.).

There is no evidence in the record that the Paco Defendants did not genuinely believe their statements in the PPM or that their optimistic belief in them was unreasonable. The PPM did not guarantee success of the venture, to the contrary, doubts were cast

and strewn in every connection including the financial speculations.

With the lack of standardized methods for known conditions it was not Paco's obligation to inform the public that the pharmaceutical industry did not adopt procedures to change this condition. The evidence adduced by plaintiffs through their expert did not meet the test of factual certainty required to make PPM's statements material or actionable.

■ When an offering document exactly states the cautionary "fact" that the plaintiff claims has been covered up or misrepresented, no § 10(b) claim will lie. *I. Meyer Pincus & Assoc. v. Oppenheimer & Co.*, 936 F.2d 759, 762–63 (2d Cir.1991) (affirming motion to dismiss).

■ Publications concerning an investment in a limited partnership may highlight "the hoped-for benefits of the Partnership" without stressing the risks and still not give rise to securities fraud if the total mix of information given to investors accurately apprises them of the risks. *Brown v. E.F. Hutton Group*, 735 F.Supp. 1196, 1201 (S.D.N.Y.1990) (Walker, J., sitting by designation). "Reliance on statements which are directly contradicted by the clear language of the offering memorandum through which plaintiffs purchased their securities cannot be a basis for a general securities fraud claim." *Feinman v. Schulman, Berlin & Davis*, 677 F.Supp. 168, 170 (S.D.N.Y.1988).

b. *The Remaining Federal Securities Claims Are Precluded, as an alternative basis for dismissal herein*

■ The Paco Defendants were charged with Dean Witter as co-conspirators in the securities fraud claimed. Judgment of dismissal with prejudice against one of the two alleged securities laws co-conspirators was entered after extensive pre-trial litigation in favor of Dean Witter, an alleged co-conspirator, on plaintiff's application. Under doctrine of claim preclusion, where there are two co-conspirators and the claims grounded in conspiracy against one are dismissed on the merits, there no longer is a co-conspirator or a basis for asserting a conspiracy to violate the securities laws against the remaining defendant so charged. In this case, the complete overlap of the claims asserted against the alleged conspirators precludes the continuance of the same claims against the alleged co-conspirator. Thus, an alternative ground for dismissal of this litigation exists apart from the principal grounds for dismissal relied on in subdivision V(a) set forth above. This is a classic case for the application on its own of the doctrine of claim preclusion apart from the solid grounds set forth in the preceding portions of this opinion.

Plaintiffs chose to bring essentially identical claims against similarly situated alleged co-conspirator defendants; claims arising out of the same operative facts, events and occurrences, created from the PPM prepared, promoted, and jointly and cooperatively structured and undertaken and projected to prospective investors. Each had evaluated the merits of the research plan and confirmed its possibilities and vouched for it as achievable, conservative and realistic.

> The participation of these defendants in the challenged transactions was not independent of that of the other defendants, and in fact in the present complaint they are named merely as "co-conspirators" with the [other] defendants.

*Ruskay v. Jensen*, 342 F.Supp. 264, 271 (S.D.N.Y.1972), *aff'd sub nom. Ruskay v. Waddell*, 552 F.2d 392 (2d Cir.), *cert. denied*, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977). *See also Cahill v. Arthur Andersen & Co.*, 659 F.Supp. 1115, 1123 (S.D.N.Y. 1986).

There is no question that all defendants were in privity with each other. The same evidence was needed to support the claims against Dean Witter and the Paco Defendants. The factual predicates of the respective assertions of claim were crucial to each set of defendants. The principal aspects of the cognizable claims were the same. The federal securities fraud claim against the Paco Defendants is identical with that dismissed by a binding stipulation by plaintiffs with Dean Witter. Intent is, of course, irrelevant to claim preclusion. "A dismissal with prejudice arising out of an agreement of the parties is an adjudication of all matters contemplated in the agreement...." *Nemaizer*

*v. Baker*, 793 F.2d 58, 62 (2d Cir.1986); *cf. Connelly Containers, Inc. v. Bernard*, 717 F.Supp. 202, 208 n. 12 (S.D.N.Y.1989).

Although issue preclusion is not involved here, it is useful to note the force of the doctrine which is akin to that of claim preclusion, mentioned in *Connelly*. As the *Connelly* court put it (717 F.Supp. at 206):

> The ... doctrine of collateral estoppel, or issue preclusion, bars "the relitigation of an issue of law or fact that was raised, litigated and actually decided by a prior judgment in a prior proceeding between the parties, if the determination of that issue was essential to the judgment, regardless of whether or not the two proceedings were based on the same claim." The party seeking to bar relitigation of the issue as a defense need not to have been a party to the original litigation.

Plaintiffs' consent dismissal of its federal securities fraud claims against Dean Witter was an adjudication of the merits, by a court of competent jurisdiction, and involved the same cause of action as plaintiffs' remaining claims against Paco, which was in privity with Dean Witter. Plaintiff's claims against Paco are therefore also precluded by the prior consent dismissal of the claims against Dean Witter.

## VI.

The open motion by the Paco Defendants for summary judgment is accordingly granted and these actions are dismissed, on the merits with prejudice and costs.

**SO ORDERED.**