MUENSTER BUTANE, INC., etc.,
Plaintiff-Appellee,

v.

The STEWART COMPANY (Penteco, Inc., substituted in place and stead of The Stewart Company), Defendant-Appellant.

No. 80–1129.

United States Court of Appeals,
Fifth Circuit.
Unit A

July 17, 1981.

in Zenith television products in Gainesville, Texas. A jury rendered a general verdict in favor of Muenster Butane, awarding damages of $50,000, trebled under the Clayton Act, Section 4 (15 U.S.C. § 15), to $150,-000, and the district judge awarded $20,000 in attorneys' fees.[2] Stewart appeals and we reverse.

## I. FACTS

Zenith Radio Corporation sells its products, specifically its line of approximately 80 different television sets, to distributors located throughout the country. These distributors in turn sell to dealers normally located in towns within a distributor's assigned geographical area. Finally, the dealers sell the television sets to the consuming public. At all times relevant to this lawsuit, Stewart was the distributor for an 84-county area in northern Texas which included Cooke County. Muenster Butane was an authorized, franchised Zenith dealer for the town of Muenster, Texas, in Cooke County. Fourteen miles to the east, in Gainesville, the Cooke County seat, Heffley T.V. was the franchised Zenith dealer.

In February 1973, Muenster Butane opened an appliance store selling Zenith sets and other large "white goods" in Gainesville, seven or eight blocks from Heffley T.V.[3] At that time, Muenster Butane had not been authorized by Stewart to sell Zeniths in Gainesville. After Muenster Butane moved in, Nick Heffley, the owner of Heffley T.V., complained repeatedly to Stewart that Gainesville was not large enough to accommodate two Zenith dealers. In response, Stewart sent a sales representative to Muenster Butane to explain that Muenster Butane was not franchised to sell

Bickel & Case, Thomas L. Case, Dallas, Tex., for defendant-appellant.

Bailey, Williams, Westfall, Lee & Fowler, James A. Williams, M. Kenneth Patterson, Dallas, Tex., for plaintiff-appellee.

Before THORNBERRY, COLEMAN and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

In this restricted dealership antitrust action, Muenster Butane, Inc., doing business as Cooke County Appliances (Muenster Butane), sued The Stewart Company (Stewart) alleging that Stewart violated Section 1 of the Sherman Act (15 U.S.C. § 1)[1] by interfering with Muenster Butane's right to deal

1. Section 1 of the Sherman Act provides in pertinent part:
   Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.

2. Section 4 of the Clayton Act provides in pertinent part:
   Any person who shall be injured in his business or property by reason of anything for-

bidden in the antitrust laws may sue therefor ... and shall recover threefold the damages by him sustained, and the cost of suit including a reasonable attorney's fee.

3. Muenster Butane changed locations of its store twice, the last time in November 1975, and eventually operated diagonally across a street intersection from Heffley T.V. (R. vol. 3 at 490).

Zeniths in Gainesville.[4] At another meeting a few days later, the sales representative and his superior requested Muenster Butane to take its Zeniths off its Gainesville showroom floor and confine itself to selling from a catalog. Muenster Butane complied with Stewart's request for a while, but began moving Zeniths back into the Gainesville store in October or November of 1973.

Relations between Muenster Butane and Heffley T.V. deteriorated, and competitive pricing of Zeniths became fierce. In late 1973, Muenster Butane suggested to Heffley that they both agree on a minimum price for their Zenith line in order assure an adequate profit. Heffley rejected this price-fixing scheme. As he explained at trial, competition from other dealers in Gainesville selling different brands of television sets was "so keen" that he knew he could not set a minimum price.[5]

In January 1974, Stewart granted Muenster Butane a franchise to sell Zeniths in Gainesville. At approximately the same time Stewart told Heffley they could do nothing about Muenster Butane in Gainesville. Heffley then ceased to complain, but intense competitive pricing continued between the stores. Heffley discontinued most of his advertising because Muenster Butane would run similar ads, underselling Heffley, or would post Heffley's own ads in

its windows with the prices reduced by $25.[6] Both Muenster Butane and Heffley took on new television lines. Muenster Butane first added Sylvania in 1973 and then replaced Sylvania with Magnavox in 1974; Heffley added RCA in late 1973 or early 1974.

In an attempt to alleviate some of the direct competitive pricing between its two dealers in Gainesville, Stewart's sales representatives decided to create a different product mix in each store. In other words, some models of Zenith sets not sold to Muenster Butane were sold to Heffley T.V. and vice versa. One aspect of this product separation was that the sales representative sold T Model Zeniths to Heffley and did not make T Models available to Muenster Butane. T Models differ from comparable regular line Zeniths only in the cabinet work; the insides of both types of sets are identical. Stewart's attempt to create some small product separation between the two Gainesville dealers was not successful; Muenster Butane purchased T Model Zeniths from another source.

Acrimonious head-to-head competition between Muenster Butane and Heffley T.V. continued throughout 1974 and 1975. Ultimately, relations between Muenster Butane and Stewart also became strained, and in 1976, Stewart terminated its franchise relationship with Muenster Butane in Gaines-

---

4. James Walterscheid, at the time a 25% owner of Muenster Butane, was the person to whom the sales representative spoke. Walterscheid recounted their conversation as follows:

> He told us we had to take our stuff out of the Gainesville store; that we were not franchised to be in Gainesville, and their original franchise with us was in Muenster, and that was the only place they were allowing us to be at that time.

(R. vol. 2 at 93)

5. Heffley explained his refusal to agree to fix a minimum price as follows:

> I said, well, no.... I never did give a retail price—suggested retail price I would set, and that wasn't because of Muenster Butane or anyone else. It was simply because the competition in town was always so keen from other manufacturers. It's a very competitive business and always has been.

(R. vol. 3 at 518)

Richard Bittner, Vice-President and General Manager of Stewart, also testified that residents of Gainesville could purchase television sets of similar "type, grade, quality, *price*, and performance" to those of Zenith in the years 1972–1979 (R. vol. 2 at 65, emphasis added). Although not explicitly stated, the clear import of Bittner's testimony was that consumers in Gainesville were free to substitute one brand of television for another and that interbrand competition was strong.

Finally, James Myrick, Muenster Butane's manager at their Gainesville store, admitted that there were "many others in the marketplace selling other than [him]self and Mr. Heffley." (R. vol. 2 at 279)

6. Answers and Deposition of Milton Thomas Heffley, at 26–27. A salesman for Stewart who took orders for advertising from Heffley also testified in deposition that Muenster Butane used Heffley's ads. Answers and Deposition of Benjamin Johns, at 10.

ville and in Muenster. Nevertheless, Muenster Butane has continued to sell Zeniths, purchased from another supplier, at both locations.

Muenster Butane brought this suit alleging that Stewart's request that Muenster Butane remove the Zeniths from the Gainesville showroom in 1973, its failure to supply Muenster Butane with T Models, and its termination of Muenster Butane violated Section 1 of the Sherman Antitrust Act. After both sides presented their evidence to the jury, Stewart moved for a directed verdict, arguing that the facts proved did not amount to an antitrust violation. The court overruled the motion. After the jury's verdict, Stewart renewed its motion in the form of a motion for judgment notwithstanding the verdict. Stewart argued that as a matter of law, under the Supreme Court's decision in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), the evidence did not establish a violation of the Sherman Act. Again, the district court overruled the motion. Stewart basically reasserts this argument on appeal, citing several recent Fifth Circuit decisions which have followed *Continental T.V.* We agree with Stewart that *Continental T.V.* governs this case and that the facts do not establish that Stewart has violated the Sherman Act.

## II. CHARACTERIZATION

### A. Horizontal v. Vertical Restraint

■ Contracts, combinations and conspiracies in restraint of trade covered by Section 1 of the Sherman Act are of two types, horizontal or vertical.[7] Horizontal combinations are cartels or agreements among competitors which restrain competition among enterprises at the same level of distribution. They are ordinarily illegal per se.[8] *Catalano, Inc. v. Target, Inc.*, 446 U.S. 643, 647, 100 S.Ct. 1925, 1927, 64 L.Ed.2d 580 (1980) (per curiam); *National Society of Professional Engineers v. United States*, 435 U.S. 679, 692–93, 98 S.Ct. 1355, 1365–66, 55 L.Ed.2d 637 (1978); *Continental T.V., supra*, 433 U.S. at 58 n.28, 97 S.Ct. at 2561 n.28 (1977). Vertical restraints are imposed by persons or firms further up the chain of distribution of a specific product (or in rare cases, further down the chain) than the enterprise restrained. Vertical non-price restraints are tested under the rule of reason;[9] that is, the plaintiff must prove that the restraint had an anticompetitive effect in the relevant market in order to prevail. *Continental T.V., supra*, 433 U.S. at 58–59, 97 S.Ct. at 2561. *See Red Diamond Supply, Inc. v. Liquid Carbonic Corp.*, 637 F.2d 1001, 1005 (5th Cir. 1981) and cases cited therein. The instant case presents a classic vertical restraint case. Stewart, a distributor, imposed certain restrictions on its dealer, Muenster Butane. Thus, Muenster Butane was required to prove that those restrictions had an anticompetitive effect in the relevant product and geographic markets.

### B. Product Market and Geographic Market

■ The only evidence in the record concerning the relevant product market convinces us that the proper scope is all availa-

---

7. Bork, *Vertical Restraints: Schwinn Overruled*, 1977 Supreme Court Rev. 171, 176. As the Supreme Court recognized in *Continental T.V., Inc. v. GTE Sylvania, Inc.*, occasionally dealers may agree among themselves to have their supplier "impose" restrictions upon them so that an ostensible vertical restraint is in reality a horizontal cartel. 433 U.S. 36, 58 n.28, 97 S.Ct. 2549, 2561 n.28, 53 L.Ed.2d 568 (1977). *See* R. Posner, Antitrust Law 148 (1976); Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality*, 48 U.Chi.L.Rev. 6, 16–17 (1981) [hereinafter cited as Posner, *Per Se Legality*].

8. Influential antitrust commentators have suggested that per se illegality of horizontal restraints may be too great a sacrifice of legitimate business practices in the name of judicial efficiency. Bork, *supra* note 7, at 177; Posner, *Per Se Legality, supra* note 7, at 25. Both writers call for an analysis of the economic underpinnings of any horizontal restraint.

9. Professors Bork and Posner argue that all vertical restraints, including price restraints, should be per se legal. Bork, *supra* note 7, at 181–82; Posner *Per Se Legality, supra* note 7, at 23–26.

ble brands of television sets.[10] Muenster Butane's fundamental mistake throughout this case has been to view the product market as confined to Zenith sets. The record contains no suggestion that Zeniths are unique or that Zenith dealers enjoy a downward sloping demand curve for their sets. Indeed, the uncontradicted testimony of Nick Heffley indicates that competition between Zenith dealers and dealers in other brands of television sets was "so keen" that he could not fix a minimum price for his Zeniths.

The issue of the relevant geographic market was never specifically considered at trial. However, the record supports the finding that the geographic market includes at least the entire town of Gainesville. Nick Heffley testified that he complained to Stewart about Muenster Butane because he thought Gainesville was too small for two Zenith dealers. This is relevant evidence that television dealers drew customers from the entire town. Other testimony indicates that the relevant geographic market might include all of Cooke County.[11] But even if we restrict the market to Gainesville, thereby increasing the likelihood that any action by Stewart would have an anticompetitive effect within the relevant geographic market, we find that under the proper economic analysis no such anticompetitive effect is shown.

## III. ANALYSIS

Our duty under the principles of the Supreme Court's holding in *Continental T.V.* is to determine whether Stewart's restrictions imposed on Muenster Butane, on balance, had an anticompetitive effect on the mar-

**10.** There is no direct testimony in the record concerning other brands of television sets available in Gainesville. However, we infer from Heffley's, Bittner's and Myrick's testimony, *see* note 5 *supra*, that several other television manufacturers had dealers in Gainesville.

**11.** James Myrick testified that his company, Muenster Butane, and Heffley T.V. helped supply the television needs of Cooke County consumers. (R. vol. 2 at 278–80)

**12.** The Supreme Court explained in *Continental T.V.*:

ket for television sets in Gainesville, Texas. "An antitrust policy divorced from market considerations would lack any objective benchmarks." *Continental T.V., supra,* 433 U.S. at 53 n.21, 97 S.Ct. at 2560 n.21. We conclude that Stewart's practices had no such effect.

### A. Intrabrand v. Interbrand Competition

Comparison of the effects of any vertical restriction on intrabrand and interbrand competition is the critical analysis required by *Continental T.V.*[12] The evidence in the record demonstrates that although Stewart's practices may have reduced intrabrand competition between Muenster Butane and Heffley T.V. somewhat, interbrand competition between Zeniths and other brands remained strong; indeed, it increased.

#### 1. Removal of Zeniths from Muenster Butane's Gainesville Showroom

At the time Stewart asked Muenster Butane to remove its television sets from its Gainesville store, Muenster Butane was not authorized by Stewart to sell Zeniths in Gainesville. Assuming that Stewart's request constituted more than mere exhortation [13] to refrain from selling, which would not be actionable in any case, Stewart's implied sanctions still did not constitute an antitrust violation.

This circuit has held, even before *Continental T.V.*, that the complete elimination of an authorized distributor or dealer by a supplier does not violate the Sherman Act. *Burdett Sound, Inc. v. Altec Corp.,* 515 F.2d

> Interbrand competition is the competition among the manufacturers of the same generic product—television sets in this case—and is the primary concern of antitrust law. . . . In contrast, intrabrand competition is the competition between distributors—wholesale or retail—of the product of a particular manufacturer.

433 U.S. at 52 n.19, 97 S.Ct. at 2558 n.19; *see id.* at 51–56, 97 S.Ct. at 2558–2561.

**13.** *See* Posner, *Per Se Legality, supra* note 7, at 12.

1245 (1975). Certainly after *Continental T.V.*, a supplier may lawfully restrict the sales of an unauthorized dealer. The reason is that vigorous interbrand competition among dealers in different television brands "provide[d] a significant check" on Stewart's exploitation of intrabrand market power in Zeniths. *Continental T.V., supra*, 433 U.S. at 52 n.19, 97 S.Ct. at 2558 n.19.

In *H&B Equipment Co. v. International Harvester Co.*, 577 F.2d 239 (5th Cir. 1978), a case closely analogous to the instant one, we stated that even if a conspiracy between a supplier and its distributor to put a second distributor out of business were proven, the supplier would not have violated the antitrust laws. Any reduction in intrabrand competition would have, at most, a *de minimus* effect on the "healthy" interbrand rivalry from other dealers. *Id.* at 246. Testimony in the record indicates that Stewart's response to Nick Heffley's complaints—to restrict Muenster Butane's sales from its Gainesville store in 1973—had no appreciable effect on the "keen" interbrand competition for television sets in Gainesville.

### 2. Stewart's Failure to Supply Muenster Butane with T Models

■ After Stewart granted Muenster Butane a franchise to operate in Gainesville, if not before, competition between Heffley and Muenster Butane was fierce. Internecine rivalry between Heffley and Muenster Butane destroyed Stewart's "efficiencies in distribution," such as dealer promotion of the product, which the Supreme Court specifically mentioned as a legitimate goal of vertical restrictions. *Continental T.V., supra*, 433 U.S. at 55–56, 97 S.Ct. at 2560. Muenster Butane's "free-riding" on Heffley T.V.'s promotional efforts—by using Heffley's own ads to demonstrate that it offered Zeniths at lower prices—discouraged Heffley from advertising at all. Clearly, Stewart had a legitimate, pro-competitive reason to want both Heffley and Muenster Butane to advertise. Increased promotion would help Zenith compete with

the other brands of television sets in the market. By early 1974, both Heffley and Muenster Butane had added other television lines to their stores. Stewart's interests lay in encouraging Heffley and Muenster Butane to promote Zeniths as well as their other brands.

Stewart's sales representative devised a plan which he thought might reduce the head-to-head competition between the two stores: variation of the store's Zenith product mix. Just as Heffley and Muenster Butane had themselves varied their brand mix to include new, and different, television lines, Stewart's representative wanted to put different models of Zeniths in each store to give them some product differentiation within the Zenith line. Product differentiation would avoid direct price comparisons and would discourage Muenster Butane from "free-riding" on the promotional efforts of Heffley.

Such a scheme could not have an anticompetitive effect on interbrand competition. Consumers were still free to substitute other comparable brands for the Zenith T Models. Indeed, consumers might substitute other Zenith models for the T Model, since T Models differed from regular models only in the cabinet work. Muenster Butane cannot reasonably expect to prevail on this second antitrust claim, unless we restrict the relevant product market to Zenith T Models. The record contains no suggestion that the demand for T Models was downward sloping. The product market remained all available brands of television sets and Stewart's restrictions had no effect on the competition within that market.[14]

### 3. Stewart's Termination of Muenster Butane

■ Even the most cursory review of this circuit's decisions since *Continental T.V.* reveals that a supplier's termination of a distributor or dealer is not a violation of the antitrust laws as long as interbrand competition acts as a "significant check on the exploitation of intrabrand market power."

---

**14.** Muenster Butane's argument on its second claim is especially weak in light of the fact that it was also receiving T Models, although from a different source.

*Continental T.V., supra,* 433 U.S. at 53 n.19, 97 S.Ct. at 2559 n.19. *See Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1005–07 (5th Cir. 1981); *Aladdin Oil Co. v. Texaco, Inc.,* 603 F.2d 1107, 1116 (5th Cir. 1979); *Daniels v. All Steel Equipment, Inc.,* 590 F.2d 111, 113 (5th Cir. 1979); *H&B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 246 (5th Cir. 1978); *Northwest Power Products, Inc. v. Omark Industries,* 576 F.2d 83, 90–91 (5th Cir. 1978), *cert. denied,* 434 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979). In our opinion in *Aladdin Oil Co. v. Texaco, Inc.* we held:

> Precedents establish that abstract lessening of intrabrand competition is not enough. Even a concerted intent to eliminate an exclusive distributor does not necessarily establish a cause of action for violation of the antitrust laws.

603 F.2d at 1116 (citing *Continental T.V.*). Where, as in this case, interbrand competition was still vigorous, termination of a dealer is insufficient to support a Sherman Act violation.

After Stewart terminated Muenster Butane as a franchised dealer, Muenster Butane did not go out of business. It found an alternative source of supply for Zeniths and continued to compete as before. Muenster Butane was still selling Zeniths at the time of trial. Thus, Stewart's efforts to reduce intrabrand competition were largely ineffectual. In addition, in the course of the three and one-half year controversy between Heffley and Muenster Butane both stores added new brands, increasing interbrand competition, and intrabrand competition in Zeniths continued unabated.

### B. Market Share

■ Some cases from this circuit adopt a market share analysis to determine the anticompetitive effect of vertical restraints. *See, e. g., Red Diamond Supply, Inc. v. Liquid Carbonic Corp.,* 637 F.2d 1001, 1005–06 (5th Cir. 1981); *Northwest Power Products, Inc. v. Omark Industries,* 576 F.2d 83, 90–91 (5th Cir. 1978), *cert. denied,* 434 U.S. 1116, 99 S.Ct. 1021, 59 L.Ed.2d 75 (1979); *Kestenbaum v. Falstaff Brewing Corp.,* 575 F.2d 564, 571 (5th Cir. 1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). *But see H&B Equipment Co. v. International Harvester Co.,* 577 F.2d 239, 243 (5th Cir. 1978). A leading commentator on vertical restraints has suggested that proof of the antitrust defendant's "substantial" market power should be a preliminary hurdle in all restricted distribution (vertical restraint) cases. "[I]f a firm lacks market power, it cannot affect the price of its product," and thus any vertical restraint could not be anticompetitive at the interbrand level. Posner, *The Next Step in the Antitrust Treatment of Restricted Distribution: Per Se Legality,* 48 U.Chi.L.Rev. 6, 16 (1981).

A requirement that plaintiff prove market power in this case would have saved the litigants and the courts much expense. Stewart (or Zenith) had no market power in Gainesville. The market was highly competitive. Whatever vertical restraints Stewart imposed on its dealers, their effect could not have been to raise the price consumers paid for television sets.

### IV. CONCLUSION

We find that although Stewart did impose certain restrictions on Muenster Butane, those vertical restraints were insufficient evidence on which to predicate antitrust liability under the holding in *Continental T.V.* Stiff interbrand competition in the relevant market shielded the consumer from any anticompetitive effect of Stewart's attempts to reduce the rivalry between its dealers. Stewart merely tried to improve its distribution efficiency by reducing intrabrand competition. Further, evidence in the record indicates that Stewart's market power was not so substantial that Stewart could affect prices by its actions. Accordingly, we reverse the jury's finding of liability on the part of Stewart; we dismiss the award of treble damages and attorneys' fees to Muenster Butane, and we render judgment in favor of Stewart.

REVERSED.