DISCON INCORPORATED, Plaintiff,

v.

NYNEX CORPORATION, NYNEX Material Enterprises, New York Telephone, Defendants.

No. 90–CV–546A.

United States District Court, W.D. New York.

Feb. 2, 2000.

Lawrence C. Brown, John H. Ring, III, Buffalo, NY, John H. Ring, III, Cheektowaga, NY, for Discon, Inc., plaintiff.

Edward S. Bloomberg, Phillips, Lytle, Hitchcock, Blaine & Huber, Buffalo, NY, Richard H. Wagner, NYNEX Corp., White Plains, NY, Guy Miller Struve, Davis, Polk & Wardwell, New York City, for NYNEX

Corp., NYNEX Material Enterprises, New York Telephone, Robert J. Eckenrode, defendants.

## DECISION AND ORDER

ARCARA, District Judge.

### INTRODUCTION

Currently before the Court is the motion of defendants NYNEX Corporation, NYNEX Material Enterprises ("MECo"), and New York Telephone ("NYT"), (referred to collectively herein as "NYNEX"), pursuant to Rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure, for summary judgment dismissing the complaint. Oral argument on the motion was held on January 21, 2000. After reviewing the submissions of the parties and hearing oral argument from counsel, the Court grants defendants' motion for summary judgment.

### BACKGROUND

This case involves the sale to telephone companies of "removal services"—*i.e.*, the dismantling and hauling away of telephone switching equipment from telephone company central offices. Plaintiff Discon, Incorporated ("Discon"), a company formed in 1984, *see* Second Amended Complaint at ¶ 36, sold such services to NYNEX beginning in 1984, when NYNEX became independent of American Telephone and Telegraph Company ("AT & T") in the Bell System breakup. *See United States v. American Tel. & Tel. Co.*, 552 F.Supp. 131 (D.D.C.1982), *aff'd sub nom., Maryland v. United States*, 460 U.S. 1001, 103 S.Ct. 1240, 75 L.Ed.2d 472 (1983).[1] In 1986,

NYNEX decided to use AT & T Technologies, rather than Discon, as a supplier of removal services.[2]

Discon brought this action against NYNEX in 1990, asserting, *inter alia,* several antitrust claims based on the 1986 termination of Discon as a supplier to NYNEX. The gist of Discon's challenge is that this choice, alleged to have been made pursuant to an agreement with AT & T Technologies, was designed improperly to raise the rates that regulators would allow NYNEX to charge its customers for telephone service. This Court dismissed Discon's initial complaint, with leave to refile. *Discon, Inc. v. NYNEX Corp.*, 1992 WL 193683 (W.D.N.Y. June 23, 1992). Discon then filed an amended complaint, which the Court subsequently dismissed with prejudice. *Discon, Inc. v. NYNEX Corp.*, Decision and Order, 90–CV–546A (W.D.N.Y. June 7, 1995).[3]

On appeal, the Second Circuit affirmed the dismissal of all but two of Discon's antitrust claims, as to which it reversed. *Discon*, 93 F.3d at 1058–62. With respect to § 1 of the Sherman Act, 15 U.S.C. § 1, the Second Circuit agreed with this Court in rejecting Discon's theories alleging a horizontal agreement and vertical price-fixing, thereby recognizing that the case involves only an alleged non-price, vertical (supplier-purchaser) agreement between NYNEX and AT & T Technologies. *See id.* at 1060 n. 5. The Second Circuit, however, revived the § 1 claim under a different legal theory from that argued by Discon, holding that "Discon has alleged a

---

1. For a summary of the Bell breakup and the factual background of this case, *see Discon, Inc. v. NYNEX Corp.*, 93 F.3d 1055 (2d Cir. 1996), *vacated*, 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998).

2. AT & T Technologies is a wholly-owned subsidiary of AT & T, and is the successor entity of the Western Electric Company, AT & T's former supply and manufacturing affiliate.

3. Discon filed a separate lawsuit against AT & T Technologies based on the same allegations,

but this Court dismissed that suit in 1992, and Discon neither appealed from that dismissal nor filed any amended complaint. *Discon, Inc. v. AT & T Technologies*, Decision and Order, 90–545A (W.D.N.Y. June 25, 1992). The Court subsequently issued an order declaring that the dismissal was with prejudice. *Discon, Inc. v. AT & T Technologies*, Order, 90–545A (W.D.N.Y. Aug. 6, 1992). Final judgment was entered in favor of AT & T Technologies and against Discon on August 6, 1992.

cause of action under, at least, the rule of reason, and possibly under the *per se* rule applied to group boycotts ..., if the restraint of trade has no purpose except stifling competition." *Id.* at 1061 (internal quotations omitted). In distinguishing this case from the "vast majority of cases" involving a buyer's "decision to discriminate in favor of one supplier over another," the Second Circuit focused only on the alleged ratepayer exploitation, concluding that NYNEX's alleged decision to choose "a more costly supplier in order to overcharge rate-paying customers" could itself constitute "entirely anticompetitive" conduct. *Id.* The Second Circuit did not examine the removal services market or discuss any grounds for inferring a market-wide anticompetitive effect from the challenged conduct.

As to Discon's claims under § 2 of the Sherman Act, 15 U.S.C. § 2, that NYNEX had monopolized and attempted to monopolize the alleged market for removal services, the Second Circuit affirmed the dismissal, explaining that NYNEX was not even a competitor, let alone an actual or threatened monopolist, in that market. *Discon, Inc.,* 93 F.3d at 1062. But, the Second Circuit revived the third of Discon's § 2 claims, specifically, that NYNEX had engaged with AT & T Technologies in a "conspiracy to monopolize." *Id.* Although Discon asserted that the conspiracy was intended to make a monopolist out of NYNEX, the Second Circuit disagreed and revived the claim on the ground that Discon had sufficiently alleged that NYNEX had instead conspired to make a removal services monopolist out of AT & T Technologies, which was allegedly Discon's principal rival in the provision of removal services. *Id.*

The Supreme Court vacated the Second Circuit's judgment and remanded for further proceedings. *NYNEX Corp. v. Discon, Inc.,* 525 U.S. 128, 119 S.Ct. 493, 142 L.Ed.2d 510 (1998). With respect to the § 1 claim, the Supreme Court held that "the *per se* group boycott rule does not

apply" to "a buyer's decision to buy from one seller rather than another," even "when that decision cannot be justified in terms of ordinary competitive objectives." *Id.* at 130, 119 S.Ct. 493. The Court stated:

> [T]he specific legal question before us is whether an antitrust court considering an agreement by a buyer to purchase goods or services from one supplier rather than another should (after examining the buyer's reasons or justifications) apply the *per se* rule if it finds no legitimate business reason for that purchasing decision. We conclude no boycott-related *per se* rule applies and that the plaintiff here [Discon] must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.,* to competition itself.

*Id.* at 135, 119 S.Ct. 493. Thus, in sum, the Supreme Court held that, even assuming NYNEX's decision to deal exclusively with AT & T Technologies emanated from some corrupt or improper motive, Discon cannot succeed on its § 1 claim unless it alleges and proves that NYNEX's action caused harm, not just to Discon itself, but to competition as a whole in the relevant market. The Court held that this requirement to allege and prove market-wide anticompetitive effects applied to both the § 1 and § 2 conspiracy claims. *Id.* at 139, 119 S.Ct. 493.

Further parting company with the Second Circuit, the Supreme Court found that any harm to telephone ratepayers resulting from NYNEX's behavior was not sufficient to prove harm to competition, because any such consumer injury naturally flowed from the exercise of market power that is lawfully in the hands of a monopolist, namely NYNEX. *Id.* at 136, 119 S.Ct. 493. The Court also rejected Discon's reliance on what Discon alleged to be a "special anticompetitive motive" to "drive Discon from the market lest Discon reveal [MECo's] behavior to [NYT] or to the relevant regulatory agency," noting that, as a logical matter, terminating Discon was

at least as likely to provoke exposure of the regulatory misconduct, as it was to promote a cover-up. *Id.* at 137–38, 119 S.Ct. 493. Finally, the Supreme Court pointed out that Discon's own First Amended Complaint "suggests the presence of other potential or actual competitors, which fact, in the circumstances, could argue against the likelihood of anticompetitive harm." *Id.* at 138–39, 119 S.Ct. 493. In this regard, the Court made specific reference to allegations: (1) that NYNEX itself was a potential competitor able to perform its own removals; (2) that "other nearby small local telephone companies needing removal services must have worked out some way to supply them;" and (3) that "entry [into the removal business] was easy, perhaps to the point where other firms, employing workers who knew how to remove a switch and sell it for scrap, might have entered that business almost at will." *Id.* at 139, 119 S.Ct. 493. The existence of these other actual or potential competitors "might have provided roughly similar checks upon 'equipment removal' prices and services with or without Discon," and argued against any harm to competition arising from Discon's demise. *Id.*

Despite NYNEX's request that it do so, the Supreme Court declined to rule on the adequacy of Discon's allegations of market-wide anticompetitive effects because, in the Court's view, such a ruling was beyond the scope of the questions presented in NYNEX's certiorari petition. *Id.* at 140, 119 S.Ct. 493. Accordingly, the Supreme Court remanded the case to the Second Circuit for further proceedings consistent with its opinion.

On remand, the Second Circuit decided, in turn, to remand the case to this Court for further proceedings. *Discon, Inc. v. NYNEX Corp.*, 184 F.3d 111, 114 (2d Cir. 1999). The Second Circuit emphasized the Supreme Court's requirement that Discon " 'must allege and prove harm, not just to a single competitor, but to the competitive process, *i.e.,* to competition itself.' " *Id.* (quoting *NYNEX*, 525 U.S. at 135, 119

S.Ct. 493). The Second Circuit instructed this Court to afford Discon the opportunity to amend its complaint to refine its allegations in light of the Supreme Court's decision, while leaving NYNEX "free to challenge whatever showing Discon can make." *Id.* The Second Circuit noted that "[i]t may well be difficult for Discon to resist a motion by NYNEX for summary judgment on the issue of lack of an adequate showing of injury to competition . . ." *Id.*

On October 18, 1999, Discon filed its Second Amended Complaint. The Second Amended Complaint asserts claims under §§ 1 and 2 of the Sherman Act and various state law claims. On November 18, 1999, NYNEX moved for summary judgment.

## DISCUSSION

### A. Summary Judgment Standard

"By avoiding wasteful trials and preventing lengthy litigation that may have a chilling effect on pro-competitive market forces, summary judgment serves a vital function in the area of antitrust law." *Tops Mkts., Inc. v. Quality Mkts., Inc.*, 142 F.3d 90, 95 (2d Cir.1998) (citations omitted). "The standard for summary judgment applies equally to antitrust cases as to any other case." *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 742 (2d Cir.1989) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

As in this case, when the nonmoving party will bear the burden of proof at trial, that party must adduce evidence "sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In evaluating the sufficiency of the evidence, facts and inferences must be viewed in the light most favorable to the party opposing summary judgment. *See Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. That being said, however, when the moving party has met its initial burden of pointing to material facts tending to show there is no genuine issue for trial, the "opponent must do more than simply show that there is some metaphysical doubt as to the material facts .... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita,* 475 U.S. at 586–87, 106 S.Ct. 1348 (citations omitted); *see also* Fed.R.Civ.P. 56(e).

### B. *Sherman Act*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States ...." 15 U.S.C. § 1. Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony." 15 U.S.C. § 2.

■ A private plaintiff seeking to state a claim for violation of §§ 1 or 2 of the Sherman Act must allege that it has suffered "antitrust injury." *See Atlantic Richfield Co. v. USA Petroleum Co.,* 495 U.S. 328, 341–44, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *G.K.A. Beverage Corp. v. Honickman,* 55 F.3d 762, 766 (2d Cir.), *cert. denied,* 516 U.S. 944, 116 S.Ct. 381, 133 L.Ed.2d 304 (1995). "The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, 'that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice.'" *George Haug Co. v. Rolls Royce Motor Cars, Inc.,* 148 F.3d 136, 139 (2d Cir.1998) (quoting *Capital Imaging Assoc. v. Mohawk Valley Med. Assoc., Inc.,* 996 F.2d 537, 543 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993)) (emphasis in original). "This requirement ensures that otherwise routine disputes between business competitors do not escalate to the status of an antitrust action." *Tops Markets,* 142 F.3d at 96 (citation omitted). "The antitrust laws ... were enacted for 'the protection of *competition,* not *competitors.*'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.,* 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States,* 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). Only if the plaintiff succeeds in establishing that the challenged action caused actual anticompetitive harm in the relevant market does the burden then shift to the defendant to establish the pro-competitive "redeeming virtues" of its conduct. *CDC Technologies, Inc. v. IDEXX Labs., Inc.,* 186 F.3d 74, 80 n. 4 (2d Cir.1999); *Capital Imaging,* 996 F.2d at 543.

NYNEX argues that it is entitled to summary judgment in this case because Discon has failed to meet its threshold burden of demonstrating that NYNEX's conduct caused market-wide injury to competition within a properly defined relevant market. The Court agrees.

### C. *Failure to Define Properly the Relevant Market*

■ As stated above, an antitrust plaintiff must demonstrate, as a threshold mat-

ter, that the defendant's conduct caused anti-competitive harm in *"the relevant market."* *Capital Imaging,* 996 F.2d at 543 (emphasis added). As part of this requirement, the plaintiff must properly define the relevant market in economically meaningful terms, since one cannot prove market-wide competitive harm without first establishing the market in which it is to be measured. *Intergraph Corp. v. Intel Corp.,* 195 F.3d 1346, 1355 (Fed.Cir.1999) (defining the relevant market is an indispensable element of an antitrust claim); *Continental Orthopedic Appliances, Inc. v. Health Ins. Plan,* 40 F.Supp.2d 109, 116 (E.D.N.Y.1999). "The relevant market must be defined according to both geography and the product or service at issue." *Hunter Douglas, Inc. v. Comfortex Corp.,* 44 F.Supp.2d 145, 151 n. 9 (N.D.N.Y.1999). Thus, in order to survive dismissal, a plaintiff asserting claims under §§ 1 and 2 of the Sherman Act "must allege a relevant geographic and product market in which trade was unreasonably restrained or monopolized." *Global Discount Travel Servs. v. Trans World Airlines, Inc.,* 960 F.Supp. 701, 704 (S.D.N.Y.1997) (citations omitted); *see also Big Bear Lodging Ass'n v. Snow Summit, Inc.,* 182 F.3d 1096, 1104–05 (9th Cir.1999) (an antitrust plaintiff must identify the relevant geographic and product markets in which the plaintiff and the defendant compete). Failure to properly define the relevant market is, standing alone, valid grounds for dismissing the complaint. *Global,* 960 F.Supp. at 705 (citations omitted); *see also International Television Productions Ltd. v. Twentieth Century–Fox Television Div. of Twentieth Century–Fox Film Corp.,* 622 F.Supp. 1532, 1539 (S.D.N.Y.1985) (complaint's "broad allegation will not suffice to delineate the relevant market in an antitrust complaint. The plaintiffs have not even attempted to explain this vague market definition").

The relevant product market is "composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 404, 76 S.Ct. 994, 100 L.Ed. 1264 (1956). The relevant geographic market encompasses the geographic area where competition occurs. *See Tampa Elec. Co. v. Nashville Coal Co.,* 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961). In other words, it is the area to which consumers can practically turn for alternative sources of the product. *Morgenstern v. Wilson,* 29 F.3d 1291, 1296 (8th Cir.1994), *cert. denied,* 513 U.S. 1150, 115 S.Ct. 1100, 130 L.Ed.2d 1068 (1995).

The Court finds that Discon has failed to define properly either a product or geographic relevant market. Accordingly, its Sherman Act claims must be dismissed.

### 1. *Relevant Product Market*

Discon's Second Amended Complaint defines the relevant product market as telephone equipment removal services for NYNEX. Second Amended Complaint at ¶¶ 127–31. Discon fails, however, to cite any precedent supporting such a single-buyer product market, nor has the Court found any.[4] To the contrary, it is firmly settled that a product market ordinarily cannot be defined in terms of the purchases of a single buyer. *See, e.g., TV Communications Network, Inc. v. Turner Network Television, Inc.,* 964 F.2d 1022, 1025 (10th Cir.) (finding no Sherman Act violation when alleged relevant product market monopolized by TNT was the TNT channel, because a company is permitted to hold a natural monopoly over its own product), *cert. denied,* 506 U.S. 999, 113 S.Ct. 601, 121 L.Ed.2d 537 (1992); *International Logistics Group, Ltd. v. Chrysler*

---

**4.** The only case cited by Discon on market definition, *Pepsico, Inc. v. Coca–Cola Co.,* 1998 WL 547088 (S.D.N.Y. Aug.27, 1998), is inapposite, as it does not involve a proposed single-buyer market definition. In that case, the product market was defined in terms of sales of fountain-dispensed soft drinks distributed by foodservice distributors throughout the United States, not sales to any one particular buyer. *See id.* at *8.

*Corp.*, 884 F.2d 904, 908–09 (6th Cir.1989) (stating that loss of contracts with a single government purchaser is not cognizable under Sherman Act), *cert. denied,* 494 U.S. 1066, 110 S.Ct. 1783, 108 L.Ed.2d 784 (1990); *Disenos Artisticos E Industriales, S.A. v. Work,* 714 F.Supp. 46, 47–48 (E.D.N.Y.1989) (generally a single product market cannot be its own relevant market).[5]

Perhaps most instructive on this point is Judge Greene's decision in *United States v. American Tel. & Tel. Co.,* 524 F.Supp. 1336 (D.D.C.1981). In that case, the government argued that for purposes of defining the relevant product market for telephone equipment, there was a separate "Bell market," consisting of products sold by Western Electric to the Bell Operating Companies, and excluding all sales (even by Western Electric) of comparable equipment to non-Bell buyers. The government attempted to defend this truncated market in terms virtually identical to those advanced by Discon here—namely, "that, because of the Operating Companies' unlawful bias toward Western Electric equipment, such equipment is effectively insulated from competition with general trade equipment." *Id.* at 1378. Such a showing, Judge Greene pointed out, "does not establish the market as a framework within which the consequences of defendants' conduct may be evaluated; rather, it demonstrates only the consequences of defendants' conduct." *Id.* Judge Greene rejected the government's approach, explaining that to define the relevant product market as "that group of products over which defendants' anticompetitive conduct exercises control, . . . as an analytic matter, reads the market definition step" out of the Sherman Act. *Id.* at 1379. Instead, Judge Greene held that in order for the government to establish a violation of the Sherman Act, it had to demonstrate that any

anticompetitive effect resulting from allegedly biased purchasing decisions occurred in a market reflecting total demand for the telecommunications equipment at issue, not just Bell's demand. *Id.* at 1380.

Judge Greene's analysis in *AT & T* is applicable here. Like the government in *AT & T,* Discon is attempting to bootstrap its claim of market-wide harm by artificially limiting the relevant product market definition to the purchasing decisions of a single buyer, NYNEX. However, under Judge Greene's reasoning in *AT & T,* to establish a violation of the Sherman Act, Discon must prove that any competitive harm resulting from NYNEX's allegedly biased purchasing decisions occurred in a market reflecting total demand for telephone equipment removal services, not just NYNEX's demand.

■ The decisions in *AT & T* and other cases rejecting single-buyer markets are based on fundamental principles of antitrust market definition. The relevant product market must encompass all the sellers of the particular product at issue, as well as reasonable substitutes, regardless of who the sellers of those competing offerings currently have as their customers. This is so because as long as what any particular customer is buying is also being sold to other buyers, such a customer has a competitive choice among all the sellers of that product or service, including the ones selling to other buyers. All of those choices—whether a particular buyer decides to consider them, or instead to ignore all options but one—must be included in the relevant market.

■ In this case, it is undisputed that there existed buyers of removal services other than NYNEX and that Discon itself attempted to, and did in fact, sell removal services to such buyers, as did its competi-

---

**5.** *See also Muenster Butane, Inc. v. Stewart Co.,* 651 F.2d 292, 295–96 (5th Cir.1981) (plaintiff's "fundamental mistake . . . has been to view the product market as confined to Zenith sets"); *Futurevision Cable Sys. of Wig-* *gins, Inc. v. Multivision Cable TV Corp.,* 789 F.Supp. 760, 776 (S.D.Miss.1992) ("a manufacturer's natural monopoly over its own product is not a basis for antitrust liability").

tors. *See* NYNEX's Statement of Undisputed Facts at ¶¶ 8–10. In fact, Discon's Second Amended Complaint states that Discon could and did seek to serve telecommunications companies other than NYNEX, such as Rochester Telephone Company and Bell South Services, Inc. *See* Second Amended Complaint at ¶ 111; *see also id.* at ¶¶ 3, 32 (alleging that AT & T Communications was another buyer of removal services in New York State). There is simply no evidence that NYNEX was the only potential purchaser of Discon's services.[6] Thus, under the applicable case law, the relevant product market in this case cannot be properly defined in terms of sales of removal services to NYNEX alone. Accordingly, summary judgment is appropriate for failure to define properly the relevant product market.[7]

### 2. *Relevant Geographic Market*

 The burden of establishing that a specified area constitutes a relevant geographic market in a particular case rests with the plaintiff. *Morgenstern,* 29 F.3d at 1296. Here, Discon defines the geographic boundaries of the relevant market in this case as "the reach of [NYT's] service area, *i.e.,* most of New York State,

excluding Rochester, Jamestown, and Middletown, and including a small area in Connecticut adjoining New York State." Second Amended Complaint, ¶¶ 131, 134. The Court finds that this proposed definition is improper as it is arbitrary, irrational and not supported by competent evidence. *See Gianna Enterprises. v. Miss World (Jersey) Ltd.,* 551 F.Supp. 1348, 1354 (S.D.N.Y.1982) ("The Court cannot accept the market boundaries offered by the plaintiff without at least a theoretically rational explanation for excluding [alternative sources from the market].").

The Supreme Court has expressly held that political boundaries, such as state and municipal boundaries, cannot be used artificially to circumscribe a relevant market, because relevant markets are defined in terms of economic realities, not political divisions. *See, e.g., United States v. Connecticut Nat. Bank,* 418 U.S. 656, 670–71, 94 S.Ct. 2788, 41 L.Ed.2d 1016 (1974) (rejecting attempt to define geographic market in terms of towns, and stating that it is "fair to assume that the area of significant competitive influence" extends across town boundaries). Thus, there is "nothing sacred about the boundary lines of a state" in considering the relevant geographic

6. Among the regulatory proceedings that have been held to investigate the issues raised in this case, the New York Public Service Commission ("PSC") conducted an audit leading to the publication of "An Operational Audit Report on New York Telephone Company's Central Office Equipment Removal Effort" (December 1989) (the "PSC Audit Report"), which is cited and relied upon by Discon in the Second Amended Complaint. *See* Item 94, Exhibit B. The PSC Audit Report states that there were numerous other providers of removal services operating throughout the United States from 1984 to 1989, providing removal services to buyers other than NYNEX. PSC Audit Report at 73.

7. At oral argument, Discon's counsel suggested that discovery on the issue of market definition may be necessary before summary judgment is appropriate. Rule 56(f) of the Federal Rules of Civil Procedure provides that the Court may deny a motion for summary judgment or order a continuance if it determines that further discovery is necessary. A party seeking to invoke Rule 56(f), however,

must file an affidavit explaining: (1) the nature of the uncompleted discovery (what facts are sought and how they are to be obtained); (2) how those facts are reasonably expected to create a genuine issue of material fact; (3) what efforts the affiant has made to obtain those facts; and (4) why those efforts were unsuccessful. *See Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.,* 769 F.2d 919, 926 (2d Cir.1985). The failure to file such an affidavit under Rule 56(f) is alone sufficient reason to reject a request that summary judgment be deferred to permit discovery. *See id.* at 926; *see also Bankers Trust Co. of California, N.A. v. Battaglia,* 1999 WL 782304, at *3 (W.D.N.Y. Aug. 23, 1999) (same). Here, Discon has not filed a Rule 56(f) affidavit. Thus, it cannot avoid summary judgment on the ground that it needs discovery. In addition, it makes no sense that Discon, a seller of removal services, would need discovery to identify buyers of removal services other than NYNEX.

market. *United States v. Bethlehem Steel Corp.*, 168 F.Supp. 576, 602 (S.D.N.Y. 1958).

Here, Discon has gone one step further, proposing a geographic market definition artificially gerrymandered to include all areas of New York (and even portions of Connecticut) where NYNEX provided service, but carefully excluding adjoining communities in both states served by other phone companies. This market definition is improper, both factually and legally. The geographic boundaries of the relevant market in this case are properly delineated by the distances which Discon and its competitors were willing to travel to service their customers, not by the limits of NYNEX's service area. *Tampa Elec.*, 365 U.S. at 327, 81 S.Ct. 623. It is undisputed that Discon and its competitors performed, or were capable of performing, removal services throughout New York State, the five states of New England, and elsewhere in the Eastern, Midwestern and Southern portions of the United States. *See* NYNEX's Statement of Undisputed Facts at ¶¶ 8–10; Second Amended Complaint at ¶¶ 40–42, 49, 58, 60, 61, 84, 111; Affidavit of Robert T. Faltisco (6/01/89) at ¶¶ 3, 7, 40, 72, 118 ("Faltisco Aff."), attached as Exhibit A to Item 94.[8] Indeed, the inappropriateness of Discon's proposed market definition is highlighted by the fact that Discon admits to making proposals to perform removal services for Rochester Telephone, and to performing work in Jamestown, New York—two New York sites Discon expressly proposes should be excluded from the relevant market. Second Amended Complaint at ¶ 111; Faltisco Aff. at ¶ 72. Discon has provided no factual or legal basis that would permit exclusion of any of these areas from the relevant geographic market.

In sum, the Court finds that Discon's proposed definition of the relevant geographic market in this case is far too narrowly drawn. Accordingly, its Sherman Act claims must be dismissed on this basis also.

**D. *Failure to Demonstrate Harm to Competition***

■ Even if the Court were to assume, *arguendo*, that the relevant product and geographic markets alleged by Discon are appropriate, Discon's antitrust claims would still fail as a matter of law as Discon has failed to demonstrate an actual market-wide adverse effect on competition resulting from NYNEX's conduct. Discon's attempt to allege market-wide anticompetitive effects is limited to a single paragraph of the Second Amended Complaint, ¶ 132. There, Discon claims that the alleged conspiracy between NYNEX and AT & T Technologies caused the following anticompetitive harm: (1) "[s]upra-competitive pricing for removal services;" (2) "[r]educed output" in that AT & T Technologies became the "only removal service vendor[ ];" and (3) "consumer injury" through alleged overcharging captive ratepayers of NYT. None of these conclusory statements, however, is sufficient to support an inference of market-wide anticompetitive harm, at least under the undisputed facts of this case.

First, the allegation that NYNEX paid increased rates for removal services does not support an inference of actual market-wide harm to competition. Although in an ordinary market the alleged ability of a *seller* to raise and sustain prices significantly might suggest an absence of effective competitive constraints, such an inference cannot be drawn under the circumstances here. At the heart of Discon's various claims against NYNEX lies the allegation that the seller and purchaser of the relevant services were engaged in an illegal effort to keep removal services prices· *high* in order to cheat ratepayers—that is, in this case, it was the

---

8. As stated above, the PSC Audit Report states that there were numerous other providers of

removal services operating throughout the United States from 1984 to 1989.

*buyer* that wanted to pay a *higher* price. In light of this allegation, it cannot be inferred that higher prices resulted from decreased competition in the overall market for removal services, rather than from the fact that NYNEX, unlike most typical buyers, had an economic interest in paying more, rather than less, for the removal services it needed. Neither is there any basis for believing that these higher prices were sustained, or could have been sustained, for any longer than NYNEX was willing to agree, for its own purposes, to be overcharged. No inference of competitive harm may properly be drawn from these facts.

Second, Discon's conclusory statement that output was reduced is not supported by any evidence that there were fewer sales of removal services in the market generally or to NYNEX in particular. Discon's elimination from the market simply does not equate to "reduced output." The Second Amended Complaint alleges that Discon made fewer sales, but it also alleges that those sales were awarded to AT & T Technologies instead. Second Amended Complaint at ¶ 3. Indeed, under Discon's own theory that NYNEX benefitted by overpaying for removal services, NYNEX also would have been motivated to order more removal services than it really needed, thus increasing, rather than decreasing, the output of such services. None of this effectively alleges, much less proves, that "output" was reduced in an economic sense, thereby giving rise to any proper inference of competitive harm.

Third, Discon's claim that the alleged conspiracy resulted in overcharging of NYT ratepayers cannot be relied on as evidence of market-wide harm to competition. As the Supreme Court stated in this case, "[w]e concede Discon's claim that [NYNEX's] behavior hurt consumers by raising telephone service rates. But that consumer injury naturally flowed not so much from a less competitive market for removal services, as from the exercise of market power that is *lawfully* in the hands of a monopolist, namely, [NYT] . . ." *NYNEX*, 525 U.S. at 136, 119 S.Ct. 493 (emphasis in original). In other words, regulatory misconduct—even if it results in inappropriately high charges to telephone customers—is not equivalent to a violation of the Sherman Act.[9] Both may harm consumers, but the appropriate legal claims and remedies arise from different bodies of law.[10]

Furthermore, Discon has failed to point to any evidence of a shortage of actual or potential competitors or barriers to entry in the overall market for removal services, without which there can be no market-wide competitive harm. The Supreme Court has repeatedly made clear that "without barriers to entry it would presumably be impossible to maintain supracompetitive prices for an extended time." *Matsushita*, 475 U.S. at 591 n. 15, 106 S.Ct. 1348; *see also Cargill, Inc. v. Monfort of Colorado, Inc.*, 479 U.S. 104, 120 n. 15, 107 S.Ct. 484, 93 L.Ed.2d 427 (1986); *Tops Markets*, 142 F.3d at 96.

In its Second Amended Complaint, Discon admits that telephone companies could and did perform removal work themselves. Second Amended Complaint at ¶ 26. Further, the low-technology nature of the business itself, with no substantial sunk costs or other up-front investments, indi-

9. Moreover, any such harm occurred in a market—the *telephone* services (not removal services) market—which is not even at issue in this case.

10. The Federal Communications Commission ("FCC"), being the proper regulatory authority to handle the activity of which Discon complains, already has conducted an independent regulatory proceeding and ordered rebates to be paid for violations of the Communications Act of 1934. *See Discon*, 93 F.3d at 1058 (citing FCC Order, 5 F.C.C.R. 866). Pursuant to a Consent Decree, and without admitting wrongdoing or violations, NYT refunded over $35 million for "unreasonable rates reflecting improper capital costs and expense charges." *See In re New York Telephone Co.*, 1990 WL 602655, 5 F.C.C.R. 5892 (1990).

cates the ready availability of alternatives. As the Supreme Court observed, "[t]he complaint's description of the removal business suggests that entry was easy, perhaps to the point where other firms, employing workers who knew how to remove a switch and sell it for scrap, might have entered that business almost at will." *NYNEX,* 525 U.S. at 139, 119 S.Ct. 493. Indeed, Discon's own experience is itself proof of ease of entry, as within six months of its formation, it won a $500,000 contract and had 25–30 employees. Second Amended Complaint at ¶¶ 57–58; Faltisco Aff. at ¶ 37.

In addition, the PSC Audit Report upon which Discon relies establishes that there was no shortage of other removal-services suppliers besides Discon. The PSC Audit Report concluded "that a large number of potential vendors have been available to perform central office equipment removal ... services since the time of divestiture [January 1, 1984]." PSC Audit Report at 9. The PSC interviewed 14 such vendors, *id.* at 2; there were five times as many vendors available as the number certified for use by NYNEX, *id.* at 13; NYNEX's files "contained inquiries from 63 central office equipment removal vendors," *id.* at 72, 80, 83; vendors actually contacting NYNEX for certification numbered 3 in 1984, 19 in 1985, 12 in 1986 (the year NYNEX stopped using Discon), and 26 in 1987, *id.* at 73; and another (much smaller) New York telephone company, Contel, "had a list of about 20 central office equipment removal vendors at the time of divestiture." *Id.* at 84. From 1986, the year when NYNEX allegedly decided to terminate Discon, to 1989, when there was allegedly a change of policy, the number of vendors certified to supply NYNEX tripled. *Id.* at 83.

Discon argues that NYNEX's certification process, which it used to narrow down the group of potential vendors it would consider for removal services, was corrupt and therefore constituted a "barrier to entry" into the removal services market.

This was not a "barrier to entry," however, in any economic sense. Discon has offered no proof that there was any shortage of potential vendors ready, willing and able to perform removal services for NYNEX had they been willing to meet NYNEX's terms. Rather, Discon's argument is that NYNEX chose the wrong vendor for the wrong reasons, not that the market offered NYNEX too few choices had it wished to make its selection on a different basis. In other words, any removal services provider—including Discon—could have sold its services to NYNEX had it simply agreed to comply with NYNEX's condition that the provider charge an artificially high price. Thus, NYNEX's certification process—corrupt or not—did not harm competition in or constitute a barrier to entry into the removal services market.

In sum, both Discon's own admissions in the Second Amended Complaint and the PSC's findings in the PSC Audit Report establish that there was no shortage of actual or potential competitors or barriers to entry in the overall market for removal services. This fact indicates that Discon cannot meet its burden of showing anti-competitive harm. *NYNEX,* 525 U.S. at 139, 119 S.Ct. 493; *CDC Technologies,* 186 F.3d at 80.

In short, not every bad act committed in business gives rise to an antitrust claim, even if harm to consumers ultimately results. The Supreme Court held in this case that in order for Discon to prevail on its Sherman Act claims, it must allege and show that NYNEX's conduct caused market-wide harm to ***competition,*** not just harm to Discon itself or to consumers in general. The undisputed facts in this case make clear that Discon has not and cannot meet this burden. As a result, summary judgment must be granted in favor of NYNEX.

### E. *Claim Preclusion*

The Court finds, in the alternative, that Discon's claims under §§ 1 and 2 of the Sherman Act must be dismissed

under the doctrine of claim preclusion.[11] Both of Discon's Sherman Act claims are based upon a purported conspiracy between the NYNEX entities (which are legally incapable of conspiring amongst themselves, *see Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 777, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)), and AT & T Technologies. When this action was commenced, a second companion case was filed by Discon—based upon the same basic facts, including the same alleged conspiracy—against AT & T Technologies (the "AT & T Technologies Case"). That action was dismissed with prejudice, on AT & T Technologies' motion, and no appeal was ever taken.[12] The Court finds that the final judgment entered against Discon in the AT & T Technologies Case precludes Discon from relitigating the same Sherman Act conspiracy claims against NYNEX in this case.

▪▪▪ Claim preclusion bars a second case if an earlier decision was: (1) a final judgment on the merits; (2) by a court of competent jurisdiction; (3) in a case involving the same parties or their privies; and (4) involving the same cause of action. *In re Teltronics Servs., Inc.*, 762 F.2d 185, 190 (2d Cir.1985). Since each of these elements is satisfied here, Discon cannot relitigate against a different co-conspirator the same Sherman Act conspiracy claims that the Court has already dismissed on the merits.

The Court's Order dismissing Discon's claims against AT & T Technologies under §§ 1 and 2 of the Sherman Act constituted a final judgment on the merits by a court of competent jurisdiction. *See Federated Dept. Stores, Inc. v. Moitie*, 452 U.S. 394,

399 n. 3, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981) (stating that for *res judicata* purposes, a Rule 12(b)(6) dismissal is a judgment on the merits); *Ramirez v. Brooklyn Aids Task Force*, 175 F.R.D. 423, 426 (E.D.N.Y.1997) (same), *aff'd*, 164 F.3d 619 (2d Cir.1998).

Although NYNEX was not named as a defendant in Discon's suit against AT & T Technologies, the pleadings are sufficient to support a finding of privity—*i.e.*, the legal conclusion that the relationship between the parties is sufficiently close to warrant claim preclusion. *See Fonseca v. Columbia Gas Sys., Inc.*, 37 F.Supp.2d 214, 227 (W.D.N.Y.1998). Courts have held that alleged co-conspirators are "in privity" with one another for *res judicata* purposes. *See In re Teltronics Services, Inc.*, 762 F.2d at 192 (newly added defendant was "alleged to be a co-conspirator in the second Southern District action filed against the [other] defendants, and is entitled to the *res judicata* effect of that decision"); *Gambocz v. Yelencsics*, 468 F.2d 837, 842 (3d Cir.1972) ("relationship of the additional parties [co-conspirators] to the second complaint was so close to parties to the first" that second action was barred); *Somerville House Management, Ltd. v. Arts & Entertainment Television Network*, 1993 WL 138736, at *3 (S.D.N.Y. Apr.28, 1993) (finding that where plaintiff had prior opportunity to raise all claims related to the disputed transaction and the same conspiracy was alleged in both actions, *res judicata* applied); *McLaughlin v. Bradlee*, 599 F.Supp. 839, 847–48 (D.D.C.1984) (defendants may "defensively assert claim preclusion against [plaintiff] even though none of the prior suits named

---

**11.** Claim preclusion is part of the broader doctrine of *res judicata*, which encompasses two separate and distinct wings of preclusion law, claim preclusion and issue preclusion. *Northern Assurance Co. of America v. Square D Co.*, 201 F.3d 84, 87 n. 2 (2d Cir. 2000).

**12.** *See Discon, Inc. v. AT & T Technologies*, Decision and Order, No. 90–545A (W.D.N.Y. June 24, 1992) (dismissing with leave to replead claims of alleged conspiracy under both

§§ 1 and 2 of the Sherman Act for failure to state a claim, pursuant to Federal Rule of Civil Procedure 12(b)(6)); *Discon, Inc. v. AT & T Technologies*, Order, No. 90–545A (W.D.N.Y. Aug. 5, 1992) (dismissing action with prejudice pursuant to Decision and Order dated June 24, 1992, because plaintiff never filed an amended complaint within the requisite time period).

all six of them as defendants," primarily because only one conspiracy was alleged in the two complaints), *aff'd,* 803 F.2d 1197 (D.C.Cir.1986). Accordingly, because NYNEX is alleged to have participated in a single conspiracy with AT & T Technologies, a sufficiently close relationship exists between the alleged co-conspirators to preclude Discon from proceeding against NYNEX in a second, separate action.

Finally, because AT & T Technologies and NYNEX were both accused of participating in a conspiracy based on the same set of operative facts, events and occurrences, the final requirement for claim preclusion has been met. In determining whether two claims constitute the same cause of action, courts have looked to such relevant criteria as whether the same evidence is necessary to maintain the claims, whether the essential facts and issues are the same, and whether the same transaction or series of transactions is at issue. *See Ramirez,* 175 F.R.D. at 427 (citations omitted). Under any test, the alleged conspiracy between AT & T Technologies and NYNEX arises from a "single core of operative facts,"and thereby constitutes the same cause of action for claim preclusion purposes. *See Berlitz Schools of Languages of America, Inc. v. Everest House, a Div. of Ambassador Intern. Cultural Foundation,* 619 F.2d 211, 215 (2d Cir. 1980) ("whatever legal theory is advanced, when the factual predicate upon which claims are based are substantially identical, the claims are deemed to be duplicative for purposes of *res judicata* ").

In sum, claim preclusion bars litigation of the Sherman Act conspiracy claims against NYNEX in this case. Here, as in the AT & T Technologies Case, Discon claims that NYNEX and AT & T Technologies conspired together to restrain trade in and to monopolize the removal services market in violation of the Sherman Act.

For some unknown reason, Discon decided to sue each co-conspirator separately in separate lawsuits. The conspiracy claims against AT & T Technologies have already been decided on the merits in favor of AT & T Technologies. In other words, there is now a final judgment, on the merits, that AT & T Technologies is not liable for conspiring with NYNEX to violate the Sherman Act. It only makes sense that if AT & T Technologies is not liable for its end of the alleged conspiracy, then NYNEX cannot be held liable for its participation on the other end of the same conspiracy. Claim preclusion mandates that where there are only two alleged co-conspirators and claims grounded in conspiracy against one are dismissed on the merits, there is "no longer a co-conspirator or a basis for asserting a conspiracy" against the remaining defendant. *Barrios v. Paco Pharmaceutical Servs., Inc.,* 816 F.Supp. 243, 252 (S.D.N.Y.1993).

### F. State Law Claims

The Court's only basis of jurisdiction over Discon's state law claims is pendent jurisdiction.[13] As all of Discon's federal claims have now been dismissed, the Court declines to exercise pendant jurisdiction over the remaining state law claims. *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) (finding that "[c]ertainly, if the federal claims are dismissed before trial ... the state claims should be dismissed as well").[14]

### *CONCLUSION*

For the reasons stated, the Court hereby grants defendants' motion for summary judgment and dismisses plaintiff's Second Amended Complaint in its entirety. The Clerk of Court is hereby ordered to enter

---

**13.** Because the original complaint here was filed prior to December 1, 1990, supplemental jurisdiction under the amendment to 28 U.S.C. § 1367 is not available.

**14.** In their papers, the parties agree that this is the proper course of action with regard to the state law claims.

judgment in favor of defendants and to take all steps necessary to close the case.

IT IS SO ORDERED